**NEWMAN–GREEN, INC.,**
**Plaintiff–Appellant,**

v.

**Alejandro ALFONZO–LARRAIN R., et al., Defendants–Appellees.**

No. 87–1195.

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 14, 1987.

Decided Oct. 28, 1987.

Reargued En Banc May 26, 1988.

Decided Aug. 11, 1988.

Rowe W. Snider, Lord, Bissell & Brook, Chicago, Ill., for plaintiff-appellant.

Charles G. Albert, Bell, Boyd & Lloyd, Chicago, Ill., for defendants-appellees.

Before BAUER, Chief Judge, and CUMMINGS, WOOD, Jr., CUDAHY, POSNER, COFFEY, FLAUM, EASTERBROOK, RIPPLE, MANION and KANNE, Circuit Judges.

POSNER, Circuit Judge.

We vacated the panel decision, and took the case en banc to decide whether a court of appeals is empowered to dismiss a party in order to retain federal jurisdiction. Previous decisions by this court had answered the question "no," but the panel disagreed and held that we may

do this, 832 F.2d 417, 419–20 (7th Cir.1987), and it went on to reverse the district court on the merits. The full court adheres to our previous decisions. "Where the record reveals no jurisdiction, we are powerless to do anything but recognize the defect." *Alderman v. Elgin, Joliet & Eastern Ry.,* 125 F.2d 971, 973 (7th Cir.1942); see also *Carson v. Allied News Co.,* 511 F.2d 22 (7th Cir.1975). The record reveals no jurisdiction, so we remand the case to the district court—of course without expressing any view on the merits—for such further proceedings as may be consistent with our jurisdictional ruling.

The suit began in 1982 when the plaintiff, Newman–Green, Inc., filed a complaint in the federal district court against five individuals who had guaranteed a debt owed to the plaintiff. The district court had no jurisdiction over the case. The naming of Bettison—a citizen of the U.S. but not of any state—as a defendant had destroyed complete diversity, *Sadat v. Mertes,* 615 F.2d 1176, 1180 (7th Cir.1980) (per curiam); see 28 U.S.C. § 1332(a); *Strawbridge v. Curtiss,* 7 U.S. (3 Cranch) 267 (1806); *Fidelity & Deposit Co. v. City of Sheboygan Falls,* 713 F.2d 1261, 1264 (7th Cir.1983); 13B Wright, Miller & Cooper, Federal Practice and Procedure § 3621 (2d ed. 1984); cf. Currie, *The Federal Courts and the American Law Institute,* 36 U.Chi.L.Rev. 1, 9–10 (1968), and there was no possible basis of federal jurisdiction except diversity, since the complaint was based exclusively on state law.

Years passed. Extensive discovery, virtually all of it directed against Bettison, was conducted, and the district judge made numerous rulings, climaxed by the grant of summary judgment for the defendants—all this in a suit over which the court had no jurisdiction. Still acting without jurisdiction, the district court entered a final judgment for the defendants under Rule 54(b) of the Federal Rules of Civil Procedure. On October 28, 1987, almost five years after the complaint had been filed, the panel before which the plaintiff's appeal had been argued—having itself raised the jurisdictional issue at oral argument, and having invited supplemental memoranda in which the plaintiff asked the panel to order Bettison dismissed and the defendants asked the panel to order the case dismissed—dismissed Bettison and proceeded to the merits.

■ Protracted proceedings have unfolded in a case over which the district court never acquired jurisdiction. For us now to confer jurisdiction on the district court retroactively to the date of the complaint— to pretend that Bettison was never a party—would violate the principle that the existence of federal jurisdiction depends on the facts when the complaint is filed, not on later facts. See, e.g., *New Orleans & Bayou Sara Mail Co. v. Fernandez,* 79 U.S. (12 Wall.) 130, 134, 20 L.Ed. 249 (1870); *St. Paul Mercury Indemnity Co. v. Red Cab Co.,* 303 U.S. 283, 289–90, 58 S.Ct. 586, 590–91, 82 L.Ed. 845 (1938); *Fidelity & Deposit Co. v. City of Sheboygan Falls, supra,* 713 F.2d at 1266; *Field v. Volkswagenwerk AG,* 626 F.2d 293, 304–05 (3d Cir.1980). "Jurisdiction cannot be obtained retroactively." *Denberg v. United States Railroad Retirement Bd.,* 696 F.2d 1193, 1197 (7th Cir.1983). To the same effect see *Mansfield, Coldwater & Lake Michigan Ry. v. Swan,* 111 U.S. 379, 381– 82, 4 S.Ct. 510, 511–12, 28 L.Ed. 462 (1884) (a case, like the present one, in which complete diversity was lacking when the case was brought); *American Nat'l Bank & Trust Co. v. Bailey,* 750 F.2d 577, 585 (7th Cir.1984); *Illinois v. General Electric Co.,* 683 F.2d 206, 209 (7th Cir.1982).

■ To the principle that federal courts cannot obtain jurisdiction retroactively, as to virtually every legal generalization, there are exceptions. One is where a court of appeals assumes jurisdiction over a partial final judgment entered under Fed.R.Civ.P. 54(b) *after* the notice of appeal had been filed. See, e.g., *Sutter v. Groen,* 687 F.2d 197, 199 (7th Cir.1982); *Local P–171, Amalgamated Meat Cutters & Butcher Workmen v. Thompson Farms Co.,* 642 F.2d 1065, 1068 (7th Cir.1981). That exception, however, involves form rather than substance, and in any event is within the specific curative provision of

Rule 4(a)(2) of the Federal Rules of Appellate Procedure: "a notice of appeal filed after the announcement of a decision or order but before the entry of the judgment or order shall be treated as filed after such entry and on the day thereof." Where the exercise of jurisdiction is discretionary (as with pendent jurisdiction), events occurring after the filing of the suit may result in or even compel a decision to relinquish that jurisdiction. See *United Mine Workers v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966). But that is not a case of obtaining jurisdiction retroactively. More important, a decision not to exercise jurisdiction presupposes the presence of jurisdiction, not its absence. "The question of power will ordinarily be resolved on the pleadings. But the issue whether pendent jurisdiction has been properly assumed is one which remains open throughout the litigation." *Id.* at 727, 86 S.Ct. at 1139. And when pendent jurisdiction is relinquished, the district court need not dismiss the case (as it would have to do if it lacked jurisdiction); it may in appropriate cases remand it to a state court. *Carnegie–Mellon University v. Cohill*, — U.S. ——, 108 S.Ct. 614, 619, 98 L.Ed.2d 720 (1988). A genuine and significant exception to the principle that jurisdiction cannot be conferred retroactively is discussed later in this opinion.

■ We can find no source for a power in a court of appeals to preserve diversity jurisdiction by dismissing a nondiverse party retroactively to the date the suit was filed. The source cannot be 28 U.S.C. § 1653, which authorizes us merely to amend "defective *allegations* of jurisdiction." (Emphasis added.) The predecessor statute (enacted in 1915) expressly limited such amendments to cases in which diversity jurisdiction "in fact existed at the time the suit was brought or removed, though defectively alleged." Act of March 3, 1915, ch. 90, 38 Stat. 956, 28 U.S.C. § 399 (1940 ed.); see *Dollar S.S. Lines, Inc. v. Merz*, 68 F.2d 594, 595 and n. 1 (9th Cir.1934); *Carson v. Allied News Co., supra*, 511 F.2d at 24 n. 6; *Thomas v. Anderson*, 223 Fed. 41, 43 (8th Cir.1915). The Revision Note to section 1653 says that, besides the extension of the power to amend from diversity cases to all cases, "changes were made in phraseology." A change from permitting a defective allegation to be amended in order to reflect more accurately the facts that create federal jurisdiction to permitting federal jurisdiction to be conferred retroactively would be more than a change in phraseology. There is a difference between a case in which the complaint alleges that a defendant is a "resident" of a state different from the plaintiff's, thus leaving open the possibility that he is a "citizen" of the plaintiff's state—but in fact the defendant is a citizen of a state other than the plaintiff's—and a case in which the defendant is a citizen of the plaintiff's state. In the first case section 1653 allows us to correct the complaint in order to show that the case is, in fact though not in pleading, within the diversity jurisdiction. (For a collection of such cases see 13B Wright, Miller & Cooper, *supra*, § 3611, at p. 518 n. 30.) In the second case the defect is not in the allegations—the "defect" is that the case is not within federal jurisdiction—and section 1653 is inapplicable.

Like any other piece of legislative history, a reviser's note is not conclusive. If the language of section 1653, or the events that led to its passage, showed that Congress wanted to empower the courts of appeals to preserve jurisdiction by adding or dropping parties, the Revision Note would have to give way. But the contrary is true. The language of the statute suggests that its only purpose was to extend the power to cure defective allegations from diversity cases to all cases. The previous statute had distinguished between the existence of jurisdiction and its being "defectively alleged," and the reference to allegations was carried forward into section 1653. There is no hint that the authors of the new statute (who were also, of course, the authors of the Revision Note) wanted to authorize courts of appeals to create jurisdiction in district courts retroactively.

The 1915 statute, the predecessor of section 1653, had, as its wording shows, been intended to overrule cases like *Denny v.*

*Pironi & Slatri*, 141 U.S. 121, 124, 11 S.Ct. 966, 967, 35 L.Ed. 657 (1891), a case of defective allegation of jurisdiction where the Court had held that "a case cannot be amended here so as to show [*show*, not *create*] jurisdiction, but the court below, in its discretion, may allow it to be done," and *Continental Life Ins. Co. v. Rhoads*, 119 U.S. 237, 7 S.Ct. 193, 30 L.Ed. 380 (1886), a similar case. The statute had not been intended to erase the distinction between "an existing diversity of citizenship defectively alleged," *Thomas v. Anderson*, *supra*, 223 Fed. at 43, and an absence of diversity jurisdiction. The original statute had made a remand to the district court to correct a defective jurisdictional allegation no longer necessary in diversity cases. Now, thanks to the amended statute, the court of appeals can correct such allegations in other types of cases as well.

But that is as far as section 1653 goes; to interpret it as going further would be to give an innocuous "change ... in phraseology" far-reaching substantive effect. The mistake in the present case was not in the allegation; it was in the assertion of federal jurisdiction over a case not within that jurisdiction. So clear is the inapplicability of section 1653—from its language and history, from the Revision Note, and from the background principle that jurisdiction cannot attach retroactively—that all seven circuits to have discussed the scope of section 1653 have said that it is intended only to enable the courts of appeals to remedy inadequate jurisdictional allegations, not defective jurisdiction itself. Besides *Carson*, and our later decision in *Sarnoff v. American Home Products Corp.*, 798 F.2d 1075, 1079 (7th Cir.1986) ("section 1653 of the Judicial Code, which allows defective allegations of jurisdiction to be corrected even on appeal, can thus be of no help to Fletcher [a plaintiff who had failed to demonstrate that his diversity claim had been worth more than $10,000 when filed]. His problem is not just pleading but also proof; we simply do not know whether his claim met the statutory minimum at the relevant time"), see *Laborers Local 938 Joint Health & Welfare Trust Fund v. B.R. Starnes Co.*, 827 F.2d 1454, 1457 n. 1 (11th Cir.1987); *Rockwell International Credit Corp. v. United States Aircraft Ins. Group*, 823 F.2d 302, 304 (9th Cir.1987); *Boelens v. Redman Homes, Inc.*, 759 F.2d 504, 512 (5th Cir.1985); *Aetna Casualty & Surety Co. v. Hillman*, 796 F.2d 770, 775–76 (5th Cir.1986); *Pressroom Unions, Etc. v. Continental Assurance Co.*, 700 F.2d 889, 893 (2d Cir.1983); *Brennan v. University of Kansas*, 451 F.2d 1287, 1289 (10th Cir.1971); *Field v. Volkswagenwerk AG*, *supra*, 626 F.2d at 306.

No statute or rule authorizes us, by the expedient of dropping—retroactively to the date the complaint was filed—an inconvenient party whose presence destroyed jurisdiction, to enter a judgment on the merits in a case that has never been within the jurisdiction of the federal courts. If the party is a nominal party, whose presence or absence does not affect jurisdiction, *Wormley v. Wormley*, 21 U.S. (8 Wheat.) 421, 451, 5 L.Ed. 651 (1823); *Wood v. Davis*, 59 U.S. (18 How.) 467, 15 L.Ed. 460 (1856); *Bacon v. Rives*, 106 U.S. (16 Otto) 99, 27 L.Ed. 69 (1882); *Navarro Savings Ass'n v. Lee*, 446 U.S. 458, 461, 100 S.Ct. 1779, 1782, 64 L.Ed.2d 425 (1980); *Matchett v. Wold*, 818 F.2d 574, 576 (7th Cir.1987); *Iowa Public Service Co. v. Medicine Bow Coal Co.*, 556 F.2d 400, 404 (8th Cir.1977), there is no harm in dismissing him, though no point either, cf. *Chathas v. Smith*, 848 F.2d 93 (7th Cir.1988). The dismissal of such a party is a mere gesture, and the issue of power does not arise. "[I]f the 'nondiverse' plaintiff is not a real party in interest, and is purely a formal or nominal party, his or its presence in the case may be ignored in determining jurisdiction. And such a party may be dropped from the case." *Iowa Public Service Co. v. Medicine Bow Coal Co.*, *supra*, 556 F.2d at 404 (citations omitted).

█ A similar type of case is where the real party in interest is substituted for a nominal party. *Mullaney v. Anderson*, 342 U.S. 415, 72 S.Ct. 428, 96 L.Ed. 458 (1952), was a suit by a fishermen's union and its secretary-treasurer on behalf of nonresident union members, challenging the constitutionality of a statute that im-

posed a higher tax on nonresident fishermen than on local fishermen. In the Supreme Court the defendant for the first time questioned the plaintiffs' standing to maintain the suit on behalf of the nonresident union members. (It is now plain that the union did have standing. See *Sierra Club v. Morton*, 405 U.S. 727, 739, 92 S.Ct. 1361, 1368, 31 L.Ed.2d 636 (1972).) In response the union moved to add two of those members as plaintiffs, and the Supreme Court granted the motion. "The original plaintiffs alleged without contradiction that they were authorized by the nonresident union members to bring this action in their behalf. This claim of authority is now confirmed in the petition supporting the motion to add the member-fishermen as plaintiffs. To grant the motion merely puts the principal, the real party in interest, in the position of his avowed agent." *Id.* 342 U.S. at 417, 72 S.Ct. at 430. It was as if the complaint had mistakenly named the lawyer rather than the client as the plaintiff. Mistakes of a clerical or otherwise purely nominal character can generally be corrected at any time, cf. Fed.R.Civ.P. 60(a); but cf. *Torres v. Oakland Scavenger Co.*, — U.S. ——, 108 S.Ct. 2405, 101 L.Ed.2d 285 (1988), but no one suggests that bringing Bettison into this suit as a defendant was a mistake of that character.

*Willingham v. Morgan*, 395 U.S. 402, 407 n. 3, 89 S.Ct. 1813, 1816 n. 3, 23 L.Ed.2d 396 (1969), and *Rogers v. Paul*, 382 U.S. 198, 86 S.Ct. 358, 15 L.Ed.2d 265 (1965), likewise involved the correction of purely technical deficiencies. *Carneal v. Banks*, 23 U.S. (10 Wheat.) 181, 188, 6 L.Ed. 297 (1825), may or may not have been such a case. In one place the Court described the joinder of the nondiverse parties as a "mistake" (*id.*), but in another (on the same page) the Court treated the suit as if it were two suits, one satisfying the requirement of complete diversity, the other dismissable and dismissed. In any event, *Carneal* involved the power of a district court, not of an appellate court, to save jurisdiction by dismissing a party; and that is an important distinction, as we shall see. *Horn v. Lockhart*, 84 U.S. (17

Wall.) 570, 579, 21 L.Ed. 657 (1873), likewise involved dismissal of the nondiverse parties by the trial court. The distinction is express in some cases, such as *Levering & Garrigues Co. v. Morrin*, 61 F.2d 115, 121 (2d Cir.1932), aff'd, 289 U.S. 103, 53 S.Ct. 549, 77 L.Ed. 1062 (1933), and there is nothing in either *Carneal* or *Horn* (decisions whose authority we accept absolutely) to suggest that the Court was opining on the powers of appellate courts. Parenthetically, we note that in *Horn* there had in fact been complete diversity from the start. The heirs of John Horn had sued the executor of his estate. One of the heirs was a citizen of the same state as the executor. For reasons entirely unclear— for there appears to have been no dispute among the heirs—the remaining heirs wanted to make this heir (Mrs. McPhail) and her husband defendants, even though the suit was on her behalf as well as theirs and even though they were seeking no relief against the McPhails. To this end the plaintiffs asked "that McPhail and his wife be made defendants, if they come within the jurisdiction of the court." The McPhails answered the complaint, admitting the truth of all of its allegations. The Court held that the district court's eventual dismissal of these two nondiverse defendants had restored complete diversity. Actually they had been joined in the suit only conditionally, and they were real parties plaintiff, not defendant, and should have been deemed realigned as such. See *City of Dawson v. Columbia Avenue Saving Fund, Etc.*, 197 U.S. 178, 180, 25 S.Ct. 420, 421, 49 L.Ed. 713 (1905); *Fidelity & Deposit Co. v. City of Sheboygan Falls, supra*, 713 F.2d at 1266–68.

■ Although section 1653 does not apply to this case, our inquiry is not ended. Federal courts possess not only the powers conferred on them by statute but also inherent powers, powers necessary to the courts' effective functioning as courts—for example, the power to punish for contempt, the power to sanction persons who file frivolous pleadings, the power to determine whether there is jurisdiction, the power, in short, to preserve the integrity of the judi-

cial process. See, e.g., *United States v. Hastings*, 461 U.S. 499, 505–06, 103 S.Ct. 1974, 1978–79, 76 L.Ed.2d 96 (1983); *In re Martin–Trigona*, 737 F.2d 1254, 1261 (2nd Cir.1984); *Dunn v. United States Dept. of Agriculture*, 654 F.2d 64, 68 (Ct.Cl.1981); *United States v. Reagan*, 453 F.2d 165, 172 (6th Cir.1971). But " 'inherent authority' is not a substitute for a good reason," *Soo Line R.R. v. Escanaba & Lake Superior R.R.*, 840 F.2d 546, 551 (7th Cir.1988), and the fact that courts have inherent authority to do some things does not empower them to disregard the limitations on their jurisdiction. Since judges are sometimes careless about jurisdiction (and sometimes make mistakes about jurisdiction without being careless), and naturally are reluctant to set at naught what may have been protracted and expensive proceedings (as in this case), one can find cases in which courts, straining at their jurisdictional leashes, have acted in excess of their jurisdiction and have tried to cure the usurpation by amending the pleadings. See, e.g., *Long v. District of Columbia*, 820 F.2d 409, 416–17 (D.C.Cir.1987); *Continental Airlines, Inc. v. Goodyear Tire & Rubber Co.*, 819 F.2d 1519, 1523 n. 3 (9th Cir.1987); *Othman v. Globe Indemnity Co.*, 759 F.2d 1458, 1463 (9th Cir.1985); *Caspary v. Louisiana Land & Exploration Co.*, 725 F.2d 189 (2d Cir.1984) (per curiam). (There are other cases, but all from the Ninth Circuit; *Long* and *Caspary* are the only cases from other circuits.) Judge Sneed spoke with refreshing candor about these cases when he said in *Continental Airlines* that "conferring jurisdiction retroactively is a curious idea," and "knowledgeable judges have said it cannot be done," but "they underestimated, it appears, judicial—or at least appellate—resolve." 819 F.2d at 1523–24 n. 3. None of the cases in this line relies on section 1653. No court has ever held that the statute empowers an appellate court to add or drop parties. The cases that have exercised an "inherent" power to preserve diversity jurisdiction by dropping a nondiverse party appear to have proceeded on the theory that courts should do what they think needs doing without inquiring too closely into their authority to do it.

The temptation to seize for reasons of trivial expediency a jurisdiction that has not been granted should be resisted, as it was by another panel of the Ninth Circuit in *Rockwell International Credit Group v. United States Aircraft Ins. Group, supra*, decided shortly after *Continental Airlines*: "the proposed amendment is not merely technical like the dismissal of a nonessential nondiverse party. The proposed amendment seeks more than the correction of 'defective allegations of jurisdiction,' a correction permissible under 28 U.S. C. § 1653. The proposed amendment attempts to create jurisdiction where none existed. The proposed amendment is not acceptable." 823 F.2d at 304. The word "nonessential" makes interpretation of this passage difficult. If the word is intended to be synonymous with "nominal," the opinion is consistent with our approach; if it means "nonindispensable," it is inconsistent but makes the passage we have quoted internally contradictory—so the former reading is preferable, though either way the reference to "dismissal of a nonessential nondiverse party" is dictum, for that was not what was being sought.

The importance of resisting temptation is especially great in cases that are within federal jurisdiction if at all only because the parties are of diverse citizenship. This is a jurisdiction that the Supreme Court has told us should be construed strictly, see *City of Indianapolis v. Chase National Bank*, 314 U.S. 63, 76–77, 62 S.Ct. 15, 20–21, 86 L.Ed. 47 (1941), in recognition of the sensitive issues of comity and federalism that its exercise involves. The Court has also told us that "the age-old rule that a court may not in any case, even in the interest of justice, extend its jurisdiction where none exists has always worked injustice in particular cases. Parties often spend years litigating claims only to learn that their efforts and expense were wasted in a court that lacked jurisdiction." *Christianson v. Colt Industries Operating Corp.*, —— U.S. ——, 108 S.Ct. 2166, 2178, 100 L.Ed.2d 811 (1988).

It would be remarkable if the federal courts of appeals had a comprehensive power, somehow inherent in their being courts, to confer jurisdiction on district courts retroactively. Suppose an Illinois citizen sues five other Illinois citizens and one Iowan. Could we five years later, after a trial on the merits, grant the plaintiff's motion to dismiss the five nondiverse defendants, in order to preserve its victory on the merits? If during the district court proceedings in this case Mr. Bettison had become a citizen of Texas, could we have backdated his change of address to the date of the complaint, to preserve jurisdiction? If the suit had been for $1,000 but judgment had been entered for $12,000, would the plaintiff have been heard to argue that if it had thought harder when it filed its complaint it would have realized that its claim satisfied the amount in controversy requirement?

The members of this court have tried to impress on each other and on the district judges of this circuit the importance of scrupulous adherence to the jurisdictional limitations of the federal courts. See, e.g., *Kanzelberger v. Kanzelberger,* 782 F.2d 774 (7th Cir.1986). If we attempt to patch up the jurisdictional deficiencies in a case when the case comes up to us on appeal, the district courts will have less incentive to police their jurisdiction themselves. They are busy courts, and if they know *we* will clean up jurisdictional messes, we will see little attention to detail by them on questions of jurisdiction. It will seem to them easier to get on with other pressing matters and leave the esoteric jurisdictional points to the court of appeals. That would not be the disciplined regard for the limits of authority that we want to encourage in the courts of this circuit; and by subjecting litigants to proceedings before a judicial body that had no authority to act, it would impose a heavy expense on the public. It is not our office to create a (federal) lawsuit where none exists and in the process create our own authority by overruling our previous decisions.

It may seem, however, that the course of this litigation could not have been affected by the jurisdictional flaw first discovered when the case was appealed. If the plaintiff had known that Bettison's presence as a defendant precluded federal jurisdiction, would it not have refrained from naming him as a defendant? But this is uncertain. The plaintiff's pretrial discovery was directed primarily at Bettison, and it is easier to get certain forms of discovery from a party than from a nonparty. See Fed.R. Civ.P. 33–35. This is not a purely theoretical distinction in the present case. Bettison, and only Bettison, responded to interrogatories and to requests for production of documents—forms of discovery available only against parties. See Fed.R.Civ.P. 33(a), 34(a). Forced to choose between a state court suit with Bettison as a defendant and a federal court suit without Bettison, the plaintiff might have chosen the state court—and who knows what view a state court would have taken of the merits of the case? But all this is beside the point, since the issue is not how severely (if at all) we should punish the plaintiff for having filed a suit that was not within the jurisdiction of the district court, but whether we have the power to determine the appropriate sanction.

■ Having determined that the district court lacked jurisdiction of this case and that we are powerless to cure this lack, we must decide whether to vacate the judgment with instructions to dismiss the suit or vacate the judgment and remand the case to the district court. We choose the latter course even though neither party has *explicitly* asked us to. The defendants asked us to dismiss the case; the plaintiff asked us to retain the case by dismissing Bettison. But the plaintiff also said that it would "present a similar motion as necessary in the District Court," and implicit in this wording is a request that if this court should decide not to drop Bettison the district court should be given a shot at the question. There was not even an implicit request in *Kanzelberger v. Kanzelberger, supra,* where, rather than remand to the district court, we directed that court to dismiss the case.

Rule 21 of the Federal Rules of Civil Procedure provides that "parties may be

924

dropped or added by order of the court ... at any stage of the action and on such terms as are just." The principle expressed in this rule is a response to the harsh common law rule that required automatic dismissal in the event of misjoinder. See Clark, Handbook of the Law of Code Pleading 352–68 (2d ed. 1947). The relevance of the principle to the question whether a misjoinder affecting jurisdiction is ever curable is apparent, and together with the broad wording of the rule may explain the large number of decisions which hold that Rule 21 (or its predecessors) empowers a district court to dismiss, at any stage of the proceedings, a party whose presence destroys complete diversity, if such dismissal is necessary to preserve diversity jurisdiction and would not harm other parties. *Horn v. Lockhart,* as noted, was one such case (and *Carneal v. Banks* may have been another). Other cases in this line include—and this is a small sample—*Conolly v. Taylor,* 27 U.S. (2 Pet.) 556, 565, 7 L.Ed. 518 (1829); *American Fire & Casualty Co. v. Finn,* 341 U.S. 6, 19 n. 18, 71 S.Ct. 534, 542 n. 18, 95 L.Ed. 702 (1951); *Fritz v. American Home Shield Corp.,* 751 F.2d 1152, 1155 (11th Cir.1985); *Park v. Didden,* 695 F.2d 626, 631 (D.C.Cir.1982); *Publicker Industries, Inc. v. Roman Ceramics Corp.,* 603 F.2d 1065, 1069 (3d Cir.1979); *Caperton v. Beatrice Pocahontas Coal Co.,* 585 F.2d 683, 692 (4th Cir.1978); *Dollar S.S. Lines, Inc. v. Merz, supra.* This court first embraced the principle in 1897, see *Mason v. Dullagham,* 82 Fed. 689 (7th Cir.1897), and it is mentioned with approval in both *Alderman v. Elgin, Joliet & Eastern Ry., supra,* 125 F.2d at 973, and *Carson v. Allied News Co., supra,* 511 F.2d at 24.

Judge Mack, whose opinion in *Dollar S.S. Lines* remains the fullest statement of the principle, pointed out that where a case is remanded to enable the district court to exercise its powers under Rule 21, the court of appeals should not express a view of the merits. See 68 F.2d at 597. For by doing so it may be handing the plaintiff an unearned tactical advantage when the plaintiff comes to decide whether to refile the case in a state court or to ask the district court to retain the case. This point provides a practical reason for the lodging of the power in question in the district courts rather than in the courts of appeals: we are spared the temptation that would be created if we had to decide whether to exercise our discretion to retain a case in the knowledge that if we did so this would allow us to decide the merits, ordinarily with finality.

Most important, the district court is better placed than the court of appeals to determine whether any party was harmed by the presence of the party that destroyed jurisdiction. In their petition for rehearing the defendants took sharp issue with the confident observation in the panel opinion that Bettison's presence in the district court had not affected the conduct of the litigation. They said that Bettison had "had a substantial impact on the posture of the case," that "virtually the sole basis for the district court's determination of liability was from the testimony of Mr. Bettison and from documents that Mr. Bettison produced," and that "none of the other guarantors had access to such materials and no other person was deposed in this litigation. In short, without Bettison, NGI [the plaintiff] had little prospect of proving its case. Guarantors were therefore clearly affected to their detriment by Mr. Bettison's presence and NGI profited enormously." These allegations may or may not be true, a question on which we express no opinion; the district court is in a better position than this court to evaluate them—indeed, that is our point.

It could be argued that the principle which allows the district court to preserve jurisdiction by dropping a party at any stage in the lawsuit is in tension with the principle that the existence of federal jurisdiction depends on the facts as they exist when the complaint is filed, and not on later events. And it could be pointed out that Rule 21 must be read in light of Rule 82 ("These rules shall not be construed to extend or limit the jurisdiction of the United States district courts"). See *Kerr v. Compagnie de Ultramar,* 250 F.2d 860, 864 (2d Cir.1958); *Hill v. Western Electric*

*Co.*, 672 F.2d 381, 398 n. 10 (4th Cir.1982) (dissenting opinion); cf. *Audi Vision Inc. v. RCA Mfg. Co.*, 136 F.2d 621, 624 (2d Cir.1943). But as law is an instrument of governance rather than a hymn to intellectual beauty, some consideration must be given to practicalities. If an easily curable jurisdictional defect is discovered shortly after a case is filed, the district court should have the power to decide whether the plaintiff must be put to the bother of filing a fresh suit rather than allowed simply to amend the complaint. See *Hackner v. Guaranty Trust Co.*, 117 F.2d 95, 98 (2d Cir.1941) (Clark, J.); cf. American Law Institute, Study of the Division of Jurisdiction Between State and Federal Courts 366 (1969). And if this point is conceded it becomes a matter of judgment when the curative power of the district court runs out. Rule 21 specifies no deadline.

None of the parties has asked us to reconsider the interpretation of Rule 21 under which the district court could have done—and, more to the point, still can do— what the plaintiff has asked us to do. This is not surprising. So many cases have adopted that interpretation that a court at our level probably can no longer reexamine it. Stare decisis has its claims, as much in interpreting Rule 21 as in interpreting section 1653. Stability is an important value in law, and is promoted by declining to revisit issues that have long been settled. Modesty alone would counsel hesitation in setting one's personal view against a view that had over a period of many years commanded the unanimous support of judges of diverse background.

And certainly this appeal is not the right time and place in which to reconsider the scope of Rule 21. The district court has not yet been asked to retain jurisdiction by dismissing Bettison, and if upon being asked the district court decides in a proper exercise of its discretion to do nothing the question of its power will be moot.

We would need a crystal ball to forecast the fate of this litigation on remand to the district court. It may turn out that, rather than do without Bettison as a defendant, the plaintiff would prefer to start over in state court, as it can do without encountering the bar of the statute of limitations. See Ill.Rev.Stat. ch. 110, ¶ 13–217. If the plaintiff decides that it would prefer to stay in federal court (its current preference), it may ask the district court to dismiss Bettison, but the district court may decide that six years of federal litigation in a suit outside its jurisdiction are enough. Conversely, that court may decide that the plaintiff's jurisdictional error was forgivable; that the plaintiff has been sufficiently punished already (for it has seen the victory it won before the panel snatched from its jaws); that when one considers that the plaintiff's error involves both an esoteric and nonintuitive point of federal jurisdiction and was an oversight by the defendants as well as by the plaintiff, it is not so grave an error as to warrant the sanction of dismissal. Excessive sanctions are as inappropriate as inadequate ones. See, e.g., *Brown v. Federation of State Medical Bds.*, 830 F.2d 1429, 1437 (7th Cir.1987). So the district court may decide to dismiss Bettison after all, though perhaps on terms different from those proposed in the panel opinion. We express no view on these questions; they are for the district court in the first instance.

*Long v. District of Columbia, supra*, 820 F.2d at 417, holds that if the district court has the power under Rule 21 to preserve diversity jurisdiction by dropping a nondiverse party, we should have the same power. *Long* gave no reason for this conclusion, however, but merely cited two cases. One, *Reed v. Robilio*, 376 F.2d 392, 394 (6th Cir.1967), makes no reference to Rule 21, and was in any event a case, like *Mullaney v. Anderson, supra*, that involved identifying the real parties in interest—not dropping a real party in interest. The other case cited in *Long* was *Mullaney* itself, which as have noted involved the joining of the real party in interest as an additional named plaintiff. *Mullaney* cited Rule 21 but without discussion of its application at the appellate level, beyond the mysterious statement (342 U.S. at 417, 72 S.Ct. at 430) that "Rule 21 will rarely come into play at this [i.e., the Supreme Court] stage of litigation"—mysterious because

"the Federal Rules of Civil Procedure, of course, apply only in the federal district courts." *International Union, UAW, Local 283 v. Scofield,* 382 U.S. 205, 217 n. 10, 86 S.Ct. 373, 381 n. 10, 15 L.Ed.2d 272 (1965). To this generalization, too, there are exceptions, not only where appellate courts adopt the civil rules to govern proceedings in the appellate court (see, e.g., 9th Cir.R. 1–1), but also where one of those rules clearly constrains appellate action, notably in the case of Rule 52(a), which provides that findings of fact by the district court shall not be set aside unless clearly erroneous. These exceptions have no application to this case. Rule 21 has not been incorporated by reference or otherwise in the Federal Rules of Appellate Procedure or in our circuit rules. Cf. *Hill v. Norfolk & Western Ry.,* 814 F.2d 1192, 1200 (7th Cir.1987) ("this court has not incorporated Rule 11 into its own rules, and therefore the rule does not apply directly to proceedings in this court"); *Hays v. Sony Corp.,* 847 F.2d 412, 429 (7th Cir.1988) (same). The result may be an irksome gap in our authority, but there it is.

The *principle* underlying a particular rule may apply to the appellate court independently of the rule itself. The principle behind Fed.R.Civ.P. 12(h)(3)—"Whenever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter, the court shall dismiss the case"—requires this court, subject to the district court's curative powers under Rule 21, to order a case dismissed when it notices a lack of subject-matter jurisdiction. See, e.g., *Rice v. Rice Foundation,* 610 F.2d 471, 474 (7th Cir.1979). Rule 12(h)(3) is an instance of the fundamental principle, which is as applicable to appellate as to trial courts, that objections to subject-matter jurisdiction cannot be waived. See, e.g., *Mansfield, Coldwater & Lake Michigan Ry. v. Swan, supra.* There is no similar overarching principle applicable alike to trial and to appellate courts that authorizes courts to repair jurisdictional defects by changing parties.

Appellate courts are not automatically invested with all the powers of district courts, as the Supreme Court has been at pains to emphasize in discussing factfinding. See *Anderson v. City of Bessemer City,* 470 U.S. 564, 573–75, 105 S.Ct. 1504, 1511–12, 84 L.Ed.2d 518 (1985). For us to assume the powers conferred by Rule 21 would be to cross the line that separates our authority from that of the district courts. Our power to act in this suit—to decide the merits, to mete out sanctions, and so forth—depends on a valid final judgment in the district court. If that court was without jurisdiction, it is not for us to create a federal case upon which to exercise our powers.

The line that the Supreme Court has with the consent of Congress drawn in Rule 21 between the powers of the trial and appellate courts of the federal system is not an irrational one. Jurisdictional problems in the district court should be resolved in the first instance by that court, rather than by this court's speculating on how that court might respond to a motion to add or drop parties. Since, moreover, that court has the power, there is no urgent need for this court to confer the same power on itself (even if we could do such a thing), however convenient this might be in a case in which we were utterly confident that a party should be added or dropped to preserve jurisdiction and enable us to reach the merits without waiting for the district court to decide a motion under Rule 21. And there is such a thing as overconfidence.

Federal judges spend lots of time telling other officials to stay within constitutional and statutory bounds, however those bounds may chafe in particular cases. If we exceed the limits of our own jurisdiction we shall be setting a bad example for litigants in the federal courts and for other persons subject to federal law. We shall be enforcing the lesson that rules on jurisdiction are inconveniences that can be got round by interpreting statutes such as 28 U.S.C. § 1653 expansively and by stretching the elastic concept of inherent judicial authority to the breaking point. We shall also be ignoring the precept (repeated just the other day, in *Kennedy v. Wright,* 851 F.2d 963, 967 (7th Cir.1988)) that "jurisdictional rules should be as simple as possi-

ble." *Coté v. Wadel,* 796 F.2d 981, 983 (7th Cir.1986). "The first characteristic of a good jurisdictional rule is predictability and uniform application." *Exchange National Bank of Chicago v. Daniels,* 763 F.2d 286, 292, modified on other grounds, 768 F.2d 140 (7th Cir.1985). Cf. *Budinich v. Becton Dickinson & Co.,* —— U.S. ——, 108 S.Ct. 1717, 1722, 100 L.Ed.2d 178 (1988). The simple rule, which is also the sensible rule and the one established by the weight of precedent, is that, subject to well-defined exceptions that do not include a free-floating discretionary power in this court to cure defects in the jurisdiction of the district courts, jurisdiction is determined on the pleadings as originally filed. If the jurisdictional *allegations* are defective but there was jurisdiction when the complaint was filed, we can cure the defect under section 1653. But if there was no jurisdiction when the complaint was filed the case must be dismissed, subject to the curative powers of the district court under Fed.R. Civ.P. 21.

The judgment is vacated and the case returned to the district court (where it will remain with Judge Shadur pursuant to Circuit Rule 36) for further consideration consistent with this opinion. No costs in this court.

CUDAHY, Circuit Judge, concurring:

I agree with the result and with the lion's share of the reasons the majority so ably propounds in reaching it. I also agree, or at least sympathize, with much of the dissent, particularly the outlook of its opening paragraphs decrying the profligate waste of resources involved in jurisdictional errors and their rectification.

Both the majority and the dissent urge the prompt repair of jurisdictional mistakes where feasible and where appropriate, by the court authorized to pursue such measures. If the dismissal of a "spoiler" is necessary to retain jurisdiction, clearly a district court may undertake this remedial task. A court of appeals, however, may

not. Section 1653 seems to me to allow appellate courts to permit correction of mistaken pleadings, not to change the configuration of a lawsuit by dropping or adding parties or changing the amount in controversy. This interpretation of section 1653 leaves us without any plausible device for empowering appellate courts to perform the necessary surgery.

I also believe that vesting these powers in the first instance in the district courts is sound policy. Here, for example, the issue is whether Bettison can be dropped without unfair prejudice to the remaining defendants. The district court is inherently better qualified to address this concern—acquainted as it is with all the practical baggage of the ongoing case—than we who must view matters from afar. Further, the district court, in deciding whether, and if so how, to remedy a jurisdictional problem, acts (hopefully) with less of an eye to the merits than we who, by restoring jurisdiction, become entitled to reverse.

I am not overly troubled by the metaphysics of retroactivity in performing jurisdictional surgery. This is particularly true when we are faced with the kind of obscure deficiencies found in the instant case. But I think these operations should be undertaken by the court clearly authorized in the premises and best informed about the practical realities of the case.

EASTERBROOK, Circuit Judge, with whom FLAUM and KANNE, Circuit Judges, join, dissenting.

It takes an average of 12 months to get a case from filing through summary judgment in the Northern District of Illinois. It took this particular case more than four years to yield the partial summary judgment that is the subject of the appeal under Fed.R.Civ.P. 54(b); more remains to be done. It takes another 11.3 months, on average, to resolve an appeal in the Seventh Circuit.[1] During these months lawyers are doing chores and sending bills;

---

1. Director of the Administrative Office of the United States Courts, *Annual Report 1987* Table B4 (appellate figures), Table C–5 (district court figures for cases terminated "during or after pretrial").

clients are stewing, their disputes festering.

Part of the time is attributable to factual and legal complexity, rules that send counsel droning through files in search of something that may turn out to be useful. Part of the time is attributable to procedural entitlements (such as 45 days to file a brief), present even if there were no other cases on the docket. Part of the time is attributable to unnecessary steps ("Your honor, I would like to file a Motion for Delay"). Much of the remaining time is attributable to congestion. The judge cannot turn to one case until done with another—and he does not spend as much time as the case deserves because he knows that there are others in the queue. Delay and the quality of justice are inversely related.

We can do something about these sources of delay, expense, and diminution in the quality of justice. Or we can make the problem worse. Today we make the problem worse. A substantial portion of this complex case has been resolved on the merits by the district court—which wrote four lengthy opinions—and by a panel of this court; the rest has been remanded so that it may be wrapped up at long last. Instead of calling it a day, so that judges can move on to fresh business (or spend more time with cases that need it), we order proceedings that will delay the case by another year or so without altering its outcome.

## I

The technical question is whether an appellate court may grant a motion dismissing a party in order to produce complete diversity of citizenship among the remaining litigants. NGI filed, and the panel granted, such a motion. See 832 F.2d 417, 419–20 (7th Cir.1987). Every court that has considered the question in the last two score years has held that an appellate court may grant such a motion. E.g., *Long v. District of Columbia*, 820 F.2d 409, 416–17 (D.C.Cir.1987); *Continental Airlines, Inc. v. Goodyear Tire & Rubber Co.*, 819 F.2d 1519, 1523 n. 3 (9th Cir.1987); *Othman v. Globe Indemnity Co.*, 759 F.2d 1458, 1463

(9th Cir.1985); *Caspary v. Louisiana Land & Exploration Co.*, 725 F.2d 189, 191–92 (2d Cir.1984); *Ross v. Electrical Workers*, 634 F.2d 453, 456–57 (9th Cir. 1980); *Fidelity & Casualty Co. v. Reserve Insurance Co.*, 596 F.2d 914, 918 (9th Cir. 1979). Cf. *Reed v. Robilio*, 376 F.2d 392, 394 (6th Cir.1967) (directing the district court to dismiss a non-diverse party that was not indispensable to the suit, and reaching the merits on the assumption this would be done). See J. Wm. Moore & Jo Desha Lucas, 3A *Moore's Federal Practice* ¶ 21.03[2] at 21–10 to 21–13 (1986 rev.); Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, 7 *Federal Practice and Procedure* § 1688; Wright, Miller & Edward Cooper, 13B *id.* at § 3605 pp. 400–03 & § 3611 pp. 518–20 (2d ed. 1984), approving the practice. Not one case since 1942 has held that an appellate court is forbidden to do this. Our decision in *Alderman v. Elgin, J. & E. Ry.*, 125 F.2d 971 (7th Cir.1942), does not give a reason for its contrary conclusion. We are convened en banc and must decide for ourselves whether *Alderman* is right.

But a discussion of appellate practice is the wrong place to start. We cannot decide what powers appellate courts possess without appreciating the authority district courts wield to dismiss parties whose presence prevents diversity jurisdiction from arising. There are three distinct questions. (A) May a district court dismiss a party whose presence spoils jurisdiction?; (B) May an appellate court do what a district court may?; (C) If dismissal is an option, is its exercise prudent? I examine these in turn.

## A

Complaints that do not invoke the district courts' subject-matter jurisdiction are regrettably common. A district court may deal with the problem in two principal ways: it may dismiss the case for want of jurisdiction and permit the plaintiff to file a new and sufficient complaint, or it may cure the defect by dismissing the party whose presence spoils jurisdiction. Rule 21

of the Federal Rules of Civil Procedure suggests the latter course, providing:

> Misjoinder of parties is not ground for dismissal of an action. Parties may be dropped or added by order of the court on motion of any party or of its own initiative at any stage of the action and on such terms as are just. Any claim against a party may be severed and proceeded with separately.

District courts frequently use their authority under Rule 21 to get rid of jurisdictional "spoilers", a procedure that has the unanimous approval of students of the subject. E.g., *Publicker Industries, Inc. v. Roman Ceramics Corp.*, 603 F.2d 1065, 1069 (3d Cir.1979) (a court "may dismiss a nondiverse party in order to achieve diversity even after judgment has been entered"); *Caperton v. Beatrice Pocahontas Coal Co.*, 585 F.2d 683, 691–92 (4th Cir.1978); *Dollar S.S. Lines, Inc. v. Merz*, 68 F.2d 594 (9th Cir.1934); Wright, Miller & Kane at § 1685 (collecting cases); Moore & Lucas at ¶ 21.03 pp. 21–10 to 21–13 (more cases); cf. ALI, *Study of the Division of Jurisdiction Between State and Federal Courts* 366 (1969) (calling dismissal of a case because of belated discovery of jurisdictional problems a "fetish of federal jurisdiction ... wholly inconsistent with sound judicial administration [that] can only serve to diminish respect for a system that tolerates it.").

If the court sees the defect early in the proceedings, it is simple to dismiss the case and await refiling. If the defect lies unrecognized for a substantial period, however, dismissal is a less attractive option. The court may have put substantial time into the case. If it is dismissed and refiled (minus the "spoilers"), another judge will need to duplicate the work—reducing judicial time available to resolve the disputes of innocent litigants in other cases.

True, dismissal penalizes the plaintiff, whose carelessness in naming parties (or in choosing federal court, given the selection of parties) is the cause of the problem. This will make lawyers more careful in future cases. Deterrence is not, however, dismissal's only effect. Dismissal well into the litigation imposes costs indiscriminately—on the plaintiff, on the defendant, on the judicial system, on other litigants waiting in the queue for judicial time. Most of these actors do not deserve to be penalized. Trying to deter legal errors by requiring cases to be relitigated conflicts with the principle that to the maximum extent possible the legal system should employ money sanctions, which do not create deadweight losses and injuries to third parties. Worse, the sanction implicit in requiring dismissal and relitigation rises the longer the case has been pending (and thus the more work must be redone); yet the optimal penalty for careless assertion of jurisdiction does not depend on the amount of time it takes to discover the problem. Quite the contrary, a problem that eludes both counsel and district judge is likely to be esoteric, as in this case.[2] The appropriate penalty for missing a fine point of federal jurisdiction is lower than the appropriate penalty for missing a basic point. Yet the cost imposed by a penalty of dismissal is likely to be higher the more abstruse the rule, because rare diseases take longer to diagnose. Any penalty for neglect should fall on the lawyers who carelessly invoked federal jurisdiction. It is undesirable to have a sanction felt more widely—burdening clients, judges, and parties in other cases— unless absolutely necessary.

---

**2.** The defect is that Bettison, a U.S. citizen living in Caracas, Venezuela, is "stateless" for purposes of the diversity jurisdiction if Caracas is his domicile. *Sadat v. Mertes*, 615 F.2d 1176, 1182 (7th Cir.1980). This is a picky jurisdictional point to start with; one might reasonably suppose that a U.S. citizen has to be a citizen of at least one state or territory, and apparently all parties to the litigation did. Perhaps Bettison is; one may be a domiciliary of a state while living elsewhere, and citizenship for diversity purposes follows domicile. The complaint does not allege Bettison's domestic domicile, however, and therefore does not invoke the mixed alien-diversity jurisdiction of 28 U.S.C. § 1332(a)(3), causing the case to flunk the complete-diversity rule of *Strawbridge v. Curtiss*, 7 U.S. (3 Cranch) 267, 2 L.Ed. 435 (1806). NGI does not now maintain that Bettison is domiciled in any state, so we must assume that the complaint did not establish federal jurisdiction.

The guarantors say that it is. The case did not come within federal jurisdiction when filed, so they maintain it must be dismissed outright. Any other conclusion, they submit, permits a federal court to "create" jurisdiction—"retroactively" to boot. Whether any given kind of "retroactive" alteration in jurisdiction is proper cannot be settled by the term. Some retroactive jurisdictional effects are common. For example, a claim within the court's pendent jurisdiction may be dismissed when the demise of the federal issue "retroactively" deprives the pendent claim of support. *United Mine Workers v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966). A case properly removed to federal court may be remanded when the deletion of the jurisdiction-giving claim "retroactively" makes removal improvident. *Carnegie–Mellon University v. Cohill*, — U.S. ——, 108 S.Ct. 614, 619–22, 98 L.Ed.2d 720 (1988). We take jurisdiction of appeals from partial final judgments, even though the partial judgment under Fed.R.Civ.P. 54(b) was not entered until after the notice of appeal had been filed—thereby "retroactively" creating jurisdiction that was not present at the beginning of the appeal. *Local P–171 v. Thompson Farms Co.*, 642 F.2d 1065, 1073–75 (7th Cir.1981). Such cases show that a "retroactive" jurisdictional effect is nothing more than taking cognizance of a change in the circumstances and parties before the court. Such a change has occurred in this case. With Bettison gone, jurisdiction lies under § 1332(a)(2) because the plaintiff is a citizen of the United States and the four defendants are citizens of Venezuela. When the district court enters a final judgment on remand, it will have subject-matter jurisdiction. From a different perspective, however, Bettison's dismissal produced jurisdiction retroactively because it permits a court to employ as the basis of decision the proceedings that took place while Bettison was present.

Whether this amount of retroactivity is permissible is a question of adjudicatory power. There can be no doubt that Article III of the Constitution supplies the power, if Congress permits the courts to use it.

The obstacle to subject-matter jurisdiction is the "complete diversity" rule of *Strawbridge*, which is not part of Article III. *State Farm Fire & Casualty Co. v. Tashire*, 386 U.S. 523, 530–31, 87 S.Ct. 1199, 1203–04, 18 L.Ed.2d 270 (1967) (the "minimal diversity" required in statutory interpleader cases satisfies the Constitution). This suit, with a citizen of Illinois on one side, five aliens (four guarantors plus NGV) and an expatriate on the other, has satisfied the constitutional minimum since the day it was filed. The suit failed to invoke a statutory grant of jurisdiction—the presence of U.S. citizens on both sides made § 1332(a)(2) unavailable, and Bettison's statelessness made § 1332(a)(3) unavailable—but the effect of a statutory defect is a statutory question.

The cases on which the defendants rely to show that that courts may not create "retroactive jurisdiction" deal with shortfalls of adjudicatory power that Congress either did not or could not do anything about. For example, in *Mansfield, Coldwater & Lake Michigan Ry. v. Swan*, 111 U.S. 379, 4 S.Ct. 510, 28 L.Ed. 462 (1884), the Court held that a case had been removed without jurisdiction when "one of the plaintiffs, and a necessary party, McMann, was a citizen of Ohio, the same State of which the defendants were citizens." *Id.* at 381, 4 S.Ct. at 511. The case could not proceed in federal court with McMann, and it could not proceed in any court without him. See also, e.g., *Shields v. Barrow*, 58 U.S. (17 How.) *130, 15 L.Ed. 158 (1854).

Things are otherwise when the non-diverse party is not essential to the litigation. Long before *Swan* the Court held that a district judge may dismiss a dispensable, non-diverse party and get on with the case—presumably "retroactively" validating any acts that had occurred before the dismissal. *Carneal v. Banks*, 23 U.S. (10 Wheat.) 181, *187–88, 6 L.Ed. 297 (1825) (Marshall, C.J.); *Horn v. Lockhart*, 84 U.S. (17 Wall.) 570, 579, 21 L.Ed. 657 (1873). (*Cameron v. McRoberts*, 16 U.S. (3 Wheat.) *591, *593–94, 4 L.Ed. 467 (1818), may be the first in this line, but the report is so

cryptic that it is hard to tell what the Court held.) Cf. *United States Parole Commission v. Geraghty*, 445 U.S. 388, 100 S.Ct. 1202, 63 L.Ed.2d 479 (1980) (a court may certify a class even after the original representative plaintiff's case becomes moot, a form of retroactive jurisdiction justified in *Geraghty* by the fact that other members of the class had live claims and a new champion might intervene and carry on the case). The trial court's ability to dismiss a party whose presence destroys jurisdiction—and then to enter a judgment binding the remaining parties, without starting the litigation from scratch—is one of the most venerable jurisdictional principles.

*Horn* was a contest among the descendants of John Horn seeking larger shares of his property. The administrator and several legatees lived in Alabama; the plaintiffs lived in Texas; some of the people who gained from the administrator's decisions also lived in Texas and were named as defendants. 84 U.S. at 573–74. These Texas defendants were real parties in interest, as the suit would determine their shares in the remaining property of the estate (or any damages the administrator would have to pay). The complaint was defective under *Strawbridge*. No one paid attention to the defect for more than three years, however. The defendants did not bring the problem to the district court's attention until a few days before it released its opinion—by which time they may have recognized, based on the extensive earlier proceedings, that they were about to lose.[3] The Supreme Court held that it was unnecessary to dismiss the case but would suffice to delete the defendants whose presence destroyed jurisdiction, so long as they were not "indispensable parties", *id.* at 579.

*Carneal* is similar. The plaintiff sued two groups of legatees, one claiming through Carneal and one through Harvie. The plaintiff had real claims against both groups, but only the Carneal group was diverse from the plaintiff. Chief Justice Marshall held that the district court could dismiss the Harvie group and proceed against the Carneal group "unless it be indispensable to bring Harvie's heirs before the court, in order to enable it to decree against Carneal's heirs." 23 U.S. at *188. *Carneal* and *Horn* show that the Court draws lines between real parties (who may be dismissed to secure jurisdiction) and indispensable parties (whose necessary presence requires the court to dismiss the case). The parties in *Carneal* and *Horn* were anything but nominal; their rights were at stake. Nominal parties' citizenship is immaterial to jurisdiction, *Bacon v. Rives*, 106 U.S. 99, 1 S.Ct. 3, 27 L.Ed. 69 (1882); *Matchett v. Wold*, 818 F.2d 574, 576 (7th Cir.1987), so there would have been no need to dismiss the non-diverse parties in these cases had they been "nominal". The Court did not hint that the parties had been improperly aligned; as it saw the cases, jurisdiction was missing when the complaints were filed, and was created by dismissing the non-diverse parties. Unless *Horn* and *Carneal* are no longer authoritative, a district court may dismiss Bettison, the "spoiler" in this case, and reenter its judgment. The Supreme Court has never questioned these cases; their holdings govern still.

The three cases from this court on which the defendants rely—*Illinois v. General Electric Co.*, 683 F.2d 206, 209 (7th Cir. 1982); *Denberg v. Railroad Retirement Board*, 696 F.2d 1193, 1197 (7th Cir.1983); *American National Bank & Trust Co. v. Bailey*, 750 F.2d 577 (7th Cir.1984)—do not deal with the deletion of parties. None cites *Carneal, Horn,* and similar cases. *General Electric*, the only one of the three in which a rule against "retroactive jurisdiction" determined the outcome, dealt with a defect in subject-matter jurisdiction under Article III. *General Electric* did not present a "case or controversy" when it was filed; we held that a controversy later

---

3. The complaint in *Horn* was filed in November 1867, and extensive proceedings were had before the defendants' motion, filed May 26, 1871, to dismiss the whole case for want of jurisdiction. The district court dismissed only the two Texas defendants whose presence spoiled complete diversity, and on June 2, 1871, gave its opinion on the merits. (These details are in the record of the case filed in the Supreme Court.)

arising between the parties could not breathe life into a case that was dead on arrival. *Denberg* was a class action filed in the wrong court, and we concluded that the status of the representative plaintiff controlled; that members of the class could have filed in that court would not support jurisdiction when the only named plaintiff could not so file. No such members had appeared to carry on the case as representatives, and the named plaintiff would not be a good representative of a class to which he did not belong. *East Texas Motor Freight System, Inc. v. Rodriguez,* 431 U.S. 395, 97 S.Ct. 1891, 52 L.Ed.2d 453 (1977). Belated intervention could present independent difficulties under Article III. See *Kremens v. Bartley,* 431 U.S. 119, 130–33 & n. 12, 97 S.Ct. 1709, 1715–17 & n. 12, 52 L.Ed.2d 184 (1977). *American National Bank* remarked that belatedly dropping a party to obtain diversity jurisdiction "raise[s] theoretical problems—for how can jurisdiction be obtained retroactively?" (750 F.2d at 585) but dropped the inquiry because, it held, there had been diversity jurisdiction from the beginning. None of these cases holds that Congress may not permit courts to repair, and then disregard, reparable defects in establishing elements of subject-matter jurisdiction with which Congress could dispense altogether.

There is something farcical in dismissing a case after decision on the merits only to have it refiled in the district court and proceed to a foreordained judgment—as this case would, for NGI could name the four Venezuelan guarantors as defendants, submit the discovery materials and obtain the decision to which it is entitled. Illinois, like other states, gives suitors a period of time notwithstanding ordinary statutes of limitations to refile actions that have been dismissed on jurisdictional and other technical grounds. See Ill.Rev.Stat. ch. 110 ¶ 13–217. To dismiss a case such as this is to impose random burdens on these litigants, the district court, and persons waiting in the queue for judicial attention. *Horn* and like cases permit district courts to avoid such wasteful proceedings.

**B**

If the district court may secure jurisdiction by dismissing parties—may do this almost four years into the case, as *Horn* holds—is there any reason why appellate courts should lack the same power? Until the last few decades the answer might have been "yes" on the ground that no rule comparable to Fed.R.Civ.P. 21 applied to appellate courts. Congress provided in the 1948 revision of 28 U.S.C. § 1653, however, that parties may amend jurisdictional allegations to cure defects even while the case is on appeal. It says:

Defective allegations of jurisdiction may be amended, upon terms, in the trial or appellate courts.

This statute equates the powers of the two courts. We know from *Carneal* and *Horn* that district courts may cure defects; we know from § 1653 that trial and appellate courts have the same powers; reparable defects in the complaint therefore do not doom the case.

True, § 1653 speaks of amending "[d]efective allegations of jurisdiction", leading to the argument that it addresses only the allegations about jurisdiction and not the existence of jurisdiction. Such a reading stresses the "of"—allegations *of* jurisdiction rather than allegations *affecting* jurisdiction—and limits the statute to rectifying the failure to name a corporation's principal place of business and similar omissions. The difficulty with this reading is that in federal practice there is no significant difference between allegations "of" and allegations "affecting" jurisdiction; the jurisdictional allegations of a complaint do both. See generally *Christianson v. Colt Industries Operating Corp.,* — U.S. —, 108 S.Ct. 2166, 100 L.Ed.2d 811 (1988). One need think only of the allegation about the amount in controversy. Unless the complaint alleges that the amount exceeds $10,000, it does not establish federal jurisdiction—even if a jury later determines that the damages in fact exceed $10,000. Because the difference between "of" and "affecting" jurisdiction is such a fine line, if it is a line at all, it is appropriate to give § 1653 the reading

that minimizes the costs of defective pleadings. The language of § 1653 does not stand in the way, and it has no pertinent legislative history. It was enacted in 1915, Act of March 3, 1915, 38 Stat. 956, without debate; the recodification and amendment in 1948 did not yield a discussion to fill the gap.[4]

Some courts have emphasized "allegations of" to reject particular proffered amendments. E.g., *Aetna Casualty & Surety Co. v. Hillman,* 796 F.2d 770, 775–76 (5th Cir.1986) (§ 1653 may not be used to add new parties); *Pressroom Unions v. Continental Assurance Co.,* 700 F.2d 889, 893–94 & n. 9 (2d Cir.1983) (same). Some of these cases contain language to the effect that § 1653 does not allow a court to "create" jurisdiction. Like any language in judicial opinions, such declarations must be read with reference to the kinds of "creation" the parties proposed. Two of the cases on which my colleagues rely show the danger of looking at loose language rather than the holdings.

In *Field v. Volkswagenwerk AG,* 626 F.2d 293, 306 (3d Cir.1980), the plaintiff, as administrator of an estate, filed a suit that did not invoke the diversity jurisdiction because the administrator was a citizen of the same state as the defendant, and an administrator's citizenship controls. When the administrator saw the problem, she moved in the district court to substitute a new administrator for the estate. That swap, for the sole purpose of creating jurisdiction, would have been collusive within the meaning of 28 U.S.C. § 1359. The district court said no; the court of appeals affirmed. As well it should, for § 1653 does not authorize a court of appeals to grant a motion seeking an unlawful dispensation. In *Boelens v. Redman Homes, Inc.,* 759 F.2d 504, 512 (5th Cir.1985), the plaintiffs wanted to amend the complaint, on appeal, "to substitute new causes of action" (759 F.2d at 512) that would have supported federal-question jurisdiction—more accurately, to resurrect four federal claims that the plaintiffs voluntarily dismissed before trial. Well of course the court said no; the motion proposed to revamp the law suit, requiring it to be restarted.

Courts that do not allow § 1653 to be used to change the face of a lawsuit on appeal also permit dropping a single party. Frequently they do not discuss their authority to do this; neither when dropping parties in some cases nor when asserting in others that § 1653 does not allow the "creation" of jurisdiction do these courts reason their way to a conclusion. *Fidelity* cites § 1653 and Rule 21 indiscriminately when dropping a party; other cases cite nothing at all; the cases that construe § 1653 strictly do not cite the cases (often

4. When enacted, the statute dealt only with jurisdictional allegations pertinent to diversity of citizenship. 28 U.S.C. § 399 (1940). The amendment and recodification in 1948 deleted the limit to diversity. Congress also deleted language in the former § 399 limiting amendments to cases in which diversity "in fact existed at the time the suit was brought." The entire legislative history in 1948 is:

   Section was extended to permit amendment of all jurisdictional allegations instead of merely allegations of diversity of citizenship as provided by section 399 of title 28, U.S.C., 1940 ed.

   Changes were made in phraseology.

What the revisers called "phraseology" lies at the heart of this case. For reasons discussed in the text, I do not rely on the unexplained deletion of the phrase quoted, for courts have exercised that power since 1825 without a statutory source.

Respectable authority supports the view that the 1948 amendments to the judicial code do not change its meaning. *Fourco Glass Co. v.* *Transmura Corp.,* 353 U.S. 222, 227, 77 S.Ct. 787, 791, 1 L.Ed.2d 786 (1957). Equally respectable authority supports the opposite view. *Tashire,* 386 U.S. at 532–33 & n. 11, 87 S.Ct. at 1204–05 & n. 11. In general, a change in language ought to be honored, because it is the text of the statute and not the revisers' notes that Congress enacts into law. *Maine v. Thiboutot,* 448 U.S. 1, 7–8 & n. 5, 100 S.Ct. 2502, 2505–06 & n. 5, 65 L.Ed.2d 555 (1980) (giving effect to a change in statutory text even though, as the dissenting opinion pointed out, the revisers and floor managers repeatedly assured Congress that nothing was being changed). The presumption of no change stated in *Fourco* is not a warrant for disregarding real changes in the text. Section 1653 was not simply changed in 1948; it was rewritten, and the revisers' notes informed Congress that at least one substantive change had been accomplished. To the extent text and revisers' notes conflict about the existence of further changes—they do not, for "changes in phraseology" covers a multitude of sins—the text wins.

in the same circuit) that permit the deletion of parties to produce jurisdiction. The back-and-forth one can find in the reports does not suggest that the subject has brought out the best from those who have written about it. There is nonetheless a sensible difference between dropping and adding parties that brings both lines of cases out right. An additional party raises problems of service, the period of limitations, even (potentially) of proving the allegations about citizenship; the extra party may have a legitimate protest; dropping a party poses none of these difficulties. Appellate courts freely permit plaintiffs to drop claims for relief, although they do not allow the addition of claims. What is true for claims is true for parties. In both *Aetna* and *Pressroom Unions* the addition of a party potentially changed substantive rights (new sources of liability, etc.); in *Aetna* even the new party would not have solved the jurisdictional problem (because it was not the real party in interest, see 796 F.2d at 775). Not a single case since 1942 denies that appellate courts have the *authority* to permit the amendment of a complaint to drop one or more parties; the deletion of a party changes a jurisdictional "allegation" in a complaint and so is authorized by a natural reading of the statute; [5] whether it is wise in any case to use that authority is a separate question, which I address in Part C below.

Section 1653 could be read the way the majority reads it. It is ambiguous, no doubt. Yet it is no more opaque than Rule 21, which all agree permits district courts to drop parties to secure complete diversity. Rule 21 says that parties may be "dropped or added" but does not say under what circumstances or mention jurisdictional consequences. Why read the Rule to allow deletions with jurisdictional effects, and the statute, which mentions jurisdiction, to exclude such a possibility? The way the majority reads § 1653, the reference to "*trial or* appellate" courts is pointless; trial courts always have had the power to allow amendments such as the allegation of a corporation's principal place of business—the only function my colleagues grant to § 1653 in either court. The way I read § 1653, the reference to trial courts has a real function—to provide a statutory source for the power to dismiss parties in order to secure diversity jurisdiction, a function that Rule 21 serves poorly if at all. (The majority pointedly observes, *supra*, 924, that Rule 21 is ill-suited to this function, given the adjuration in Rule 82 against treating the civil rules as affecting jurisdiction; no such obstacle confronts § 1653.)

Anyway, Rule 21 has never been necessary to the district court's power. The Supreme Court recognized that power more than a century before there was a Rule 21; why should appellate courts be different, now that § 1653 treats the two tribunals identically? If this smacks of "inherent powers" so be it, but I mean no such claim. An "inherent" or "supervisory" or plain vanilla common law power is an essential underpinning of an order compelling someone to do something he would rather not. If a court should direct the plaintiff to dismiss a party to perfect its jurisdiction, it would need a source of authority (inherent or otherwise). But the plaintiff is master of its complaint. If the plaintiff wants to drop all claims against a defendant, why look for judicial powers? The question is:

---

5. The majority cites *Rockwell International Credit Corp. v. United States Aircraft Insurance Group*, 823 F.2d 302 (9th Cir.1987), *supra*, at 922–23, as a case in which a court "resisted" the "temptation to seize for reasons of trivial expediency a jurisdiction that has not been granted". One might think, by its placement immediately after a group of cases holding that an appellate court may grant a motion to dismiss a non-essential non-diverse party, that *Rockwell* disagrees with these cases. Not so. *Rockwell* states, 823 F.2d at 304, that an appellate court *may* permit "the dismissal of a nonessential nondiverse party"—exactly the proposition the panel accepted. *Rockwell* then holds that the case at hand *was not of that type* because the sole named defendant was an unincorporated association, so it was impossible to produce jurisdiction by dismissing some of its members —all of which were indispensable under Rule 19, yet none of which had been named in the complaint. The remand in *Rockwell* was to consider sanctions under Rule 11, not to consider the dismissal of parties. No one doubts that if it is impossible to create diversity by dismissing a party, an appellate court may not do so—because no one may. Such a holding does not advance the majority's argument.

"What's to prevent it?" The plaintiff amends its complaint and that's that. A court might deny leave to amend or attach conditions—such acts require authority. We routinely allow (nay, encourage) parties to drop legal theories or whole claims on appeal, without suggesting that the party needs our approval or that we have overstepped the powers of appellate courts. NGI dropped a defendant rather than a claim, and it took no special authority to allow that deletion to have its natural jurisdictional consequence. What's to prevent it?

Let us return, however, to § 1653, the repository of the statutory powers of *both* district and appellate courts, if such powers be needed. *Thomas v. Anderson*, 223 F. 41 (8th Cir.1915), is the only case holding that § 1653 may not be used to dismiss a party on appeal.[6] *Thomas* relied on *Denny v. Pironi*, 141 U.S. 121, 11 S.Ct. 966, 35 L.Ed. 657 (1891), and derivatively on *New Orleans v. Winter*, 14 U.S. (1 Wheat.) *91, 4 L.Ed. 44 (1815). These cases mean, the Eighth Circuit thought, that "the cure, if there can be one, must be had in the court of original cognizance, not in the appellate court." 223 F. at 43. Yet a cure in the district court would be as "retroactive" as a cure in the appellate court; it would just be more time-consuming. *Thomas* did not deal with the language of § 1653 (allegations may be amended "in the trial or appellate courts."); obviously *Winter* and *Denny* have nothing to do with that statute, not enacted until two months before *Thomas* was released.

The plaintiffs in *Winter* sued on an obligation represented to be joint; one of the plaintiffs was a citizen of a territory, and therefore "stateless" under statutes then in force. This spoiled complete diversity. After invoking *Strawbridge* Chief Justice Marshall continued: "[H]aving ·elected to sue jointly, the court is incapable of distinguishing their case, so far as respects jurisdiction, from one in which they were compelled to unite." 14 U.S. at *95. The de-

fect, as the Court saw it, was not reparable anywhere. (*Winter* predates *Carneal* and *Cameron*, which may explain why the Court did not permit inquiry into whether the obligation was several rather than joint, which would have permitted the dismissal of the "spoiler".)

*Denny* involved a classically defective allegation: the complaint alleged the plaintiffs to be "residents" rather than "citizens" of California. After losing, the defendant flagged the problem; the plaintiffs remitted $5 of their judgment by a document portraying them as citizens of California. The Court held this remittitur insufficient because the defendant did not have an opportunity to contest its assertions. It remanded so that the plaintiffs could make the jurisdictional allegation in form capable of contravention. Along the way it remarked: "A case cannot be amended here so as to show jurisdiction, but the court below, in its discretion, may allow it to be done", 141 U.S. at 124, 11 S.Ct. at 967. This was dictum, for the plaintiffs had not attempted to amend any allegation in the Supreme Court, and it played no role in the Court's rationale (which dealt with the defendant's inability to contest the allegation). It had some support, however, for in *Continental Insurance Co. v. Rhoads*, 119 U.S. 237, 7 S.Ct. 193, 30 L.Ed. 380 (1886), the plaintiffs had tried to amend their jurisdictional allegations in the Supreme Court. The Court replied, without giving a reason: "If the plaintiff was actually a citizen of Pennsylvania when the suit was begun, the record cannot be amended here so as to show that fact, but the court below may, in its discretion, allow it to be done when the case gets back." *Id.* at 240, 7 S.Ct. at 193. *Rhoads* does not suggest that anything in Article III requires this apportionment of functions between trial and appellate courts, which Congress eliminated by enacting § 1653.

---

**6.** *Levering & Garrigues Co. v. Morrin*, 61 F.2d 115, 121 (2d Cir.1932), aff'd on other grounds, 289 U.S. 103, 53 S.Ct. 549, 77 L.Ed. 1062 (1933), relies on *Thomas* and notes § 1653 in passing, remarking that it does not avail "for it does not appear that in fact the necessary diversity existed." This is a reference to language in the former version of § 1653 that was deleted in 1948. See note 4 above.

In more recent years, the Supreme Court has allowed jurisdictional repair work in its halls—has allowed, indeed, repair work more extensive than that in this case. In *Mullaney v. Anderson,* 342 U.S. 415, 72 S.Ct. 428, 96 L.Ed. 458 (1952), the defendants questioned the plaintiffs' standing, and thus the existence of a case or controversy under Article III. To avoid the problem, the Court permitted two new plaintiffs to intervene after the court of appeals had decided the case. If the original plaintiffs lacked standing, the intervention produced "retroactive jurisdiction" of the most striking kind. But Justice Frankfurter wrote for the Court, *id.* at 417, 72 S.Ct. at 430:

> Rule 21 of the Federal Rules of Civil Procedure authorizes the addition of parties "by order of the court on motion of any party or of its own initiative at any stage of the action and on such terms as are just." ... To grant the motion merely puts ... the real party in interest [in the case]. The addition of these two parties plaintiff can in no wise embarrass the defendant. Nor would their earlier joinder have in any way affected the course of the litigation. To dismiss the present petition and require the new plaintiffs to start over in the District Court would entail needless waste and runs counter to effective judicial administration—the more so since, with the silent concurrence of the defendant, the original plaintiffs were deemed proper parties below.

These new parties were essential, on the Court's assumptions, to the existence (more accurately, to the creation in the Supreme Court) of a justiciable case. My colleagues treat this as a trivial change: "It was as if the complaint had mistakenly named the lawyer rather than the client as the plaintiff." *Supra,* at 921. Yet a complaint naming only the lawyer would not invoke any statutory grant of jurisdiction; under Art. III no statute could confer such jurisdiction. So the jurisdictional flaw in *Mullaney* was more serious than the one here. The alteration was "technical", *supra,* at 922, only in the sense that the dismissal of Bettison is—afterward, the case was within federal jurisdiction and could be decided on the

merits without a need to supplement the record or hold further argument. See also *Willingham v. Morgan,* 395 U.S. 402, 407 n. 3, 89 S.Ct. 1813, 1816, n. 3, 23 L.Ed.2d 396 (1969) (relying on § 1653 to permit a party to amend a jurisdictional allegation after removing a case from state court, despite the removal statute's requirement that the petition for removal show federal jurisdiction); *Rogers v. Paul,* 382 U.S. 198, 199, 86 S.Ct. 358, 359, 15 L.Ed.2d 265 (1965) (permitting intervention of new plaintiffs in the Supreme Court to preserve an Article III controversy); Robert L. Stern, Eugene Gressman & Stephen M. Shapiro, *Supreme Court Practice* 340–42 (6th ed. 1986). Whatever lessons *Winter, Denny,* and *Rhoads* once taught about roles of trial versus appellate courts, there is a new text.

The majority's argument that allegations "of" jurisdiction in § 1653 means something different from allegations "affecting" jurisdiction is a plausible, though unconvincing, interpretation of the text. Two other lines of argument have nothing to do with § 1653. One, which weaves through several portions of my colleagues' effort, is that a federal court may not act in excess of its jurisdiction. True but irrelevant. This court has jurisdiction on appeal from a judgment made final under Rule 54(b). At the time the appeal was filed, the complaint did not establish subject-matter jurisdiction. If Bettison should be dismissed, the complaint would establish jurisdiction. The majority reluctantly concludes that a district court may grant a motion dismissing Bettison. If a district court may do this, there is no jurisdictional bar to our doing so; the two courts are identically situated. There may be reasons why we may (or ought) not act on NGI's motion, but these have nothing to do with *our* jurisdiction. The second argument, *supra,* at 926–27, is that jurisdictional rules should be clear and simple. Anyone who looks up the majority's citations will learn that I am the last to disagree. This is irrelevant to our problem, though. The majority favors the rule "A district court may dismiss a party to secure diversity jurisdiction but an appellate court may not", while I favor the rule "Both

district and appellate courts may dismiss a party to secure diversity jurisdiction". Whatever else may be said for or against these rules, they are equally clear and simple.

Whether an appellate court may do what the district court may do has nothing to do with "retroactive jurisdiction", with "nominal" versus "real" parties, with "technical" versus "substantive" changes, with the need for clear rules, or with inducing parties to pay more attention to jurisdictional elements of their cases. It has to do with the allocation of functions among judges, which affects whether there is to be duplicative effort. At the time *Rhoads* was decided, jurisdictional allegations, like pleadings in general, could be amended only in the district court. This allocation of functions has been abandoned long since. The Rules of Civil Procedure of 1938 give less weight to the timing of amendment; the pleadings are amended to conform to the course of proceedings (Rule 15(c); cf. Rule 54(c)), although one could say that unless the plaintiff gets the allegations right the first time the case must be dismissed and refiled. Appellate courts have the same power to accept amended pleadings that district courts have. We try to cut out steps that serve no function, see *Communication Workers v. NLRB*, 784 F.2d 847, 849–50 (7th Cir.1986), a principle that comes to the fore here. If there is to be a rule against "retroactive jurisdiction", that rule should apply to trial and appellate courts equally. As the Supreme Court has held since 1825, however, district courts may create jurisdiction by dismissing parties, retroactively validating earlier acts. If district courts may do this, so may appellate courts.

### C

To say that an appellate court may dismiss a party in order to secure subject-matter jurisdiction is not to say that it ought to. A court should consider carefully whether dismissing one party would produce an unjustified injury to another; we ordered the suit dismissed in *Kanzelberger* because the presence of the non-diverse party had produced a tactical advantage for one side. A court also should consider whether restarting the litigation would be the preferable course either because of its exemplary value or because a fresh consideration would be likely to produce a more accurate resolution. These considerations do not, however, lead to outright dismissal of this case—or, as my colleagues have it, to a narrow reading of § 1653.

The four Venezuelan guarantors contend that to do other than dismiss this suit deprives them of due process of law. By naming Bettison as a party, the Venezuelan guarantors contend, NGI was able to depose him, while it would have been confined to interrogatories if he had been a party. This is not accurate. Rule 30(a) of the civil rules permits litigants to take depositions of non-parties. Bettison—the principal manager of both NGV and Venvalvex—would have been a central figure whether or not named as a defendant personally. Bettison's absence from the United States may have required NGI to invoke 28 U.S.C. § 1783(a), but recalcitrance may be a problem with parties as well as non-party witnesses.

The Venezuelan guarantors insisted at oral argument before the full court that if they had known from the start that Bettison was not a party, they might have treated him as a hostile rather than a friendly witness, producing a different record. They did not supply particulars, and it is not apparent what they might have done differently. At all events, the four Venezuelan guarantors got notice that Bettison was a party and could have protected themselves, if this is what they thought best. The complaint invoked § 1332(a)(3) as the grant of subject-matter jurisdiction. The defendants could have read § 1332(a)(3) and discovered that Bettison's presence in the case was fatal to jurisdiction. They could have insisted on his dismissal at the outset, with whatever advantages and disadvantages that entailed. They did not; instead their answer to the complaint admitted that the district court had subject-matter jurisdiction and denied only the existence of personal jurisdiction.

The Venezuelan guarantors conceded subject-matter jurisdiction not only in the district court but also in this court. Circuit Rule 28(b) requires the appellant's brief to contain a full statement of the district court's subject-matter jurisdiction, with particulars. It concludes:

> The appellee's brief shall state explicitly whether the jurisdictional summary in the appellant's brief is complete and correct. If it is not, the appellee shall provide a complete jurisdictional summary.

This rule is designed to ensure that every party to the litigation checks the facts and law important to subject-matter as well as appellate jurisdiction. The jurisdictional summary in NGI's brief disclosed all the facts necessary to defeat jurisdiction.[7] The defendants' brief recites: "The jurisdictional summary contained in the Brief for [NGI] adequately states the bases for the jurisdiction of the trial court". Litigants who repeatedly—in answering the complaint, and in addressing the jurisdictional issue on appeal—fail to detect a flaw are not in a strong position to contend that had they known of the defect they would have handled the case differently. Had they thought a different strategy beneficial, they would have searched more diligently for defects. There is no reason why the judicial system should protect parties in big-stakes commercial litigation who fail to protect themselves.

Another kind of injury might be pertinent here. The guarantors other than Bettison may be injured in fact by Bettison's dismissal: they must pay the $200,000 (plus interest) for the pre-November 1979 sales without Bettison's help, and they are exposed to liability for other sales. I gather from NGI's representations at the first oral argument that Bettison has property in the United States on which NGI may have planned to levy. This is not, however, the sense of prejudice that matters. The guarantors are jointly and severally liable, so none is an indispensable party under Fed. R.Civ.P. 19(b). See *Bio–Analytical Services, Inc. v. Edgewater Hospital, Inc.*, 565

F.2d 450, 452–53 (7th Cir.1977); *Jett v. Philips & Associates*, 439 F.2d 987, 990 (10th Cir.1971). NGI could have sued only the four Venezuelan guarantors in the first place, putting them in the same position they occupy once NGI dismisses Bettison. Bettison's presence in the district court did not affect the conduct of the litigation.

To the extent a claim of prejudice presents questions of fact or inference, it would be wise in the ordinary course to remand the case to the district court, which is in the best position to determine whether the presence of the extra party affected the outcome. A remand is neither necessary nor appropriate in this case, however, for two reasons. First, the guarantors have not asked for one. NGI moved in this court to dismiss Bettison as a party; the guarantors opposed that motion but did not ask for a remand or an evidentiary hearing; they did not request an initial decision from the district judge but addressed their arguments wholly to the panel. The guarantors' petition for rehearing en banc also did not suggest that the district court should be invited to resolve the question. The guarantors asked for, and got, our views; they have never suggested that they want anyone else's. We should hold them to the strategy they have chosen. Second, this is a "paper case". Bettison's presence was important only to the extent it made discovery from him easier to conduct. It did not create access to information that otherwise could not have been reached (non-parties may be deposed and required to produce documents at their depositions). Ease in securing information is not the sort of "prejudice" that requires new trials. The determination of prejudice therefore does not depend on the district court's closer perspective on the litigation. (Which may be why the guarantors have not asked for a remand.)

If remanding cases of this character were likely to make parties and judges more careful, and so diminish the number of flaws needing correction in the future,

---

7. It stated, in part: "NGI is an Illinois Corporation with its principal place of business at Addison, DuPage County, Illinois.... William L. Bettison is a United States citizen residing in Caracas."

then remand would be *de rigueur.* Unfortunately, remands will not have this effect. Consider why parties are likely to take care. If one defendant both spoils jurisdiction and causes prejudice to the remaining parties, the best safeguard is *other defendants'* alertness. The aggrieved party will flag the problem in order to protect its own interests. If we throw cases such as this one back, defendants will take less care, because they can count on district judges to protect them whether they look out after their own interests or not. Would either the plaintiff or the district judge take more care to make up for this shortfall? Unlikely. Since the case may be refiled, the plaintiff has little to lose. The losers are the parties in *other* cases, who must wait longer for judicial attention. They cannot protect themselves from time-wasting steps in strangers' litigation. Would the district judge take more care? That too is unlikely, for he can grant the motion dismissing the spoiler and reenter the judgment. The kind of case in which district courts need to take more care is the kind in which the jurisdictional shortfall cannot be remedied. These waste judicial time utterly. The kind of case we have here, however, is one in which most or all of the time already spent will be salvaged, with the application of some additional time.

In the end, then, my colleagues adopt an approach that will induce defendants to be less cautious without inducing anyone to be more cautious and that will throw good time after bad as the case shambles toward the same outcome it has already received. I try to be as vigilant as any other judge in throwing out of the federal courts cases that do not belong here; I'm delighted to see that so many others on the court agree with this approach; but with Bettison gone, this case *does* belong here, and we should have as few wasted steps as possible on the route to a final disposition of a case that is properly in federal court.

## II

What will happen on remand? Two things are most probable. One: The district judge might agree with the panel of this court that NGI is entitled to amend its complaint to dismiss Bettison as a party. If that happens, the district court will reenter its judgment, NGI will file another appeal, the case will be briefed anew, and about a year later we will decide that NGI is entitled to recover on the guaranty, remanding for *still more* proceedings in the district court to quantify the recovery and resolve lingering questions, of which there are several.[8] In the meantime other litigants will be cooling their heels. Two: The district judge might agree with the four Venezuelan guarantors that they suffered some "prejudice" as a result of Bettison's presence in the case, and if so the court will dismiss the case. About 10 minutes later, NGI will refile the case under the citizen-alien jurisdiction provided by 28 U.S.C. § 1332(a)(2), naming as defendants the original set except for Bettison. NGI will tender all of the discovery materials and move for summary judgment. The discovered information is admissible in evidence. All of the discovery in this case was voluntary; there is no erroneous ruling by the district judge to be set aside; and voluntary discovery may not be undone on the ground that if one party had it to do over, he would have been obstreperous instead of accommodating. With luck the case will be assigned to Judge Shadur, who promptly will renew his rulings—following which NGI will appeal, leading to the inevitable remand from this court. But there are 21 active judges in the Northern District of Illinois, so there is less than a 5% chance that Judge Shadur will get the new complaint. If he does not (and if the Executive Committee does not transfer it to him), some unlucky district judge must slog through this record and make a fresh decision, following which the loser will appeal, and so on. The final disposition will be the same—but the parties' legal bills will be higher, and judges' time will have been diverted from the needs of other litigants,

---

**8.** This is what the panel held, and the defendants did not argue in their petition for rehearing

that the panel misunderstood Illinois law.

who must suffer the fallout of a problem not of their making. The right word for all of this would be featherbedding, if judges made plumbers' wages.

Now there are other paths this case could take, with lower probability. Judge Shadur might impose sanctions under Fed. R.Civ.P. 11, because NGI filed the complaint without adequately investigating the jurisdictional issue and the defendants answered without investigating it either. Such awards are appropriate for frivolously invoking federal jurisdiction, but the defect here was so esoteric that even Judge Shadur, a jurisdiction-hound, did not catch it, so it's hard to give counsel a strapping. *FDIC v. Elefant*, 790 F.2d 661, 667 (7th Cir.1986); cf. *Wojan v. General Motors Corp.*, 851 F.2d 969, 974–976 (7th Cir.1988), (no sanctions when both sides ignored a jurisdictional problem). But if he should impose sanctions, this would consume a little more time (followed by an inevitable appeal), and the case then would take one of the two paths already mapped. Perhaps Judge Shadur would dismiss the case, finding that Bettison's presence prejudiced the other guarantors during discovery, and then the judge who drew the new assignment would exclude the evidence gathered from Bettison. Then even *more* time would go down the rat-hole as counsel painstakingly (and painfully) recompiled all of the same information—time squandered, because I cannot imagine a decent ground for the exclusion. But in the end the evidence would be reduced to possession a second time, and the case would go its way to judgment.

Perhaps, my colleagues speculate, NGI would give up on the district court and move to state court (or Venezuela), where it can reach all defendants. A great many zeroes precede the first significant digit in the probability of this, however. After the panel of our court flagged the jurisdictional problem, NGI had to decide what it wanted to do. NGI had lost the bulk of its case in the district court (although it had won some $200,000 on a portion of the case no longer in dispute). It was guaranteed a new run at the subject in state court, against all defendants, by retaining Betti-son as a defendant. NGI instead filed a motion to dismiss Bettison and take its chances on the merits. If it was willing to pursue this suit in federal court without Bettison when all it had to show for itself was a loss, and to abandon any hope of reaching Bettison's assets if it should prevail, what is it going to do now that it has an opinion in its favor on the merits? Go to state court, where things could get worse but are not likely to get better? If this suit is dismissed, it will be refiled in federal court. The only question is just how much time will be lost along the way.

Why?

My colleagues say: Because an appellate court is powerless to grant a motion dismissing a party whose presence spoils jurisdiction. Although the conclusion is want of power, a reading of the court's opinion does not convey the impression that the majority is acting under legal compulsion. It is going against every decision on point since 1942; and as the majority says when recognizing that district courts may cure jurisdictional defects: "law is an instrument of governance rather than a hymn to intellectual beauty, [so] some consideration must be given to practicalities." *Supra*, at 925. The majority's disposition is not compelled. One can almost see federal judges licking their chops at the prospect of bouncing out of court a miscreant who named one too many defendants. Gotcha! Maybe the district court will complete the process, evicting NGI, never to darken the federal court's door again. Yet this is a case within federal jurisdiction. True, the complaint failed to invoke a statutory grant when it received a file stamp, but the complaint as amended (by dropping Bettison) comes within § 1332(a)(2). This case, in the judgment of Congress, belongs in federal court. It is likely to stay in federal court. The only serious question is how much more legal time it will chew up before final judgment in federal court. Where you end up often depends on where you start. I start with a belief that Congress has provided for federal jurisdiction in this case and we ought to resolve it on

the merits with speed and economy; having resolved it that way, we should stick with the decision.

The only apparent injury is to Bettison, who has participated in this litigation and faces the prospect of a second suit in state court. Had NGI filed this case in the courts of Illinois or Venezuela, or sued Bettison in one court while pursuing the Venezuelan guarantors in another, his liability would have been finally determined in a single litigation. NGI's carelessness about federal jurisdiction is responsible for this problem, which the panel dealt with by conditioning the grant of NGI's motion on terminating with prejudice the litigation against Bettison. To the extent NGI was counting on reaching Bettison's assets to satisfy any judgment, his dismissal is a significant penalty for NGI's assertion of federal jurisdiction. My colleagues' approach, by contrast, penalizes the federal judiciary and litigants in unrelated cases for the jurisdictional problems that have arisen in this one, and it rewards defendants who have not looked after their own interests. Penalizing the innocent to protect the indolent is not the highest calling of a mature judicial system.