AFFILIATED FM INSURANCE COM-
PANY, Plaintiff-Counterdefendant,

v.

BEATRICE FOODS CO.,
Defendant-Counterplaintiff,

v.

UNIGARD MUTUAL INSURANCE
COMPANY, Third-Party
Defendant.

No. 81 C 1960.

United States District Court,
N.D. Illinois, E.D.

March 1, 1985.

Mark W. Rattan, Phelan, Pope & John, Ltd., Chicago, Ill., for Affiliated FM.

Butler, Rubin, Newcomer, Saltarelli & Boyd, Chicago, Ill., for Beatrice Foods.

Charles N. Besser & Assoc., Chicago, Ill., for third-party defendant Unigard.

## MEMORANDUM OPINION AND ORDER

GETZENDANNER, District Judge:

This action for declaratory judgment is before the court on plaintiff Affiliated FM

Insurance Co.'s ("Affiliated") amended motion for partial summary judgment in its favor against defendant Beatrice Foods Co. ("Beatrice"). In the motion, Affiliated seeks a declaration that, under the terms of a general liability policy issued to Beatrice, it is not liable for damages awarded by Judge Patrick Kelly in the lawsuit *Mattingly, Inc. v. Beatrice Foods Co.*, No. 78–1094 (D.Kan. Aug. 9, 1983). For the reasons stated below, the motion is granted in part, and denied in part.

The facts underlying this lawsuit are as follows. On or about April 1974, Affiliated issued to Beatrice an excess liability insurance policy providing coverage for property damage liability assessed against Beatrice provided such damages were caused by an "occurrence." The policy elsewhere defines "occurrence" as an "accident, including continuous or repeated exposure to conditions, which results in personal injury or property damage neither expected nor intended from the standpoint of the insured."

Subsequent to the issuance of this policy, Beatrice became the defendant in a number of lawsuits arising out of defects in the manufacture and sale of a swimming pool coating known as Marabalon, which was marketed through Beatrice's Farboil division. Beatrice requested Affiliated to indemnify it for such damages as might be assessed in these actions. Affiliated denied coverage, and initiated the present action for a declaration that the policy issued to Beatrice does not cover these damages. Beatrice counterclaimed against Affiliated, and instituted a third-party complaint against Unigard Mutual Insurance Co. ("Unigard"), its other excess liability insurer. On September 28, 1983, this court denied both Beatrice's and Affiliated's motion for summary judgment with respect to several issues not pertinent to the present motion.

On August 10, 1983, the United States District Court for the District of Kansas awarded Mattingly, Inc. and Mattingly Pools, Inc., $1,618,308.37 in compensatory damages and $1,000,000 in punitive damages against Beatrice for breach of warranty and fraud in connection with Farboil's marketing and sale of Marbalon. *Mattingly, Inc. v. Beatrice Foods Co.*, No. 78–1094 (D.Kan.), Memorandum Order dated Aug. 10, 1983. In the present motion for summary judgment, Affiliated seeks the following declarations: (1) that the compensatory damages awarded in *Mattingly* are excluded from coverage because they were "expected or intended from the standpoint of the insured" within the meaning of the policy, and (2) that the punitive damages awarded in *Mattingly* are neither covered by the Affiliated policy nor recoverable as a matter of public policy. The parties agree that Illinois law governs these questions.

### The Mattingly Case

For present purposes, the court accepts the findings of the *Mattingly* court as true, and will address the collateral estoppel effects of those findings later. Mattingly, Inc. and Mattingly Pools, Inc. (collectively hereafter "Mattingly") were engaged in the pool construction and servicing business. From 1974 through 1977, Mattingly used Marbalon as its pool coating in reliance on representations from Farboil employees that Marbalon would apply easily to pool surfaces, could be used to recoat plastered pools, would last four to five years, and would be white in color. Mattingly also relied on Farboil representations that Sylvan Pools, a nationally known company, was already using Farboil's products and that Marbalon was the result of years of research and testing. In fact, however, Sylvan Pools had not yet decided to use Marbalon as of the date these representations were made, and Marbalon was marketed on the basis of laboratory testing only. Moreover, although Farboil's representatives claimed to be very experienced with pool coatings, Farboil had done no such work until the original Marbalon formula was brought to them in 1972.

From one month after its first application of Marbalon, Mattingly encountered numerous problems with peeling, staining, and recoating. Over a three-year period, Mattingly attempted to work out these

problems by recoating its pools with epoxy pursuant to Farboil's advice. The epoxy proved chemically incompatible with Marbalon, however, and caused large blisters to form on the pool surface. As a result, Mattingly was forced to sandblast the coatings off its customers' pools at great expense.

In November 1974, Farboil began producing a clear top coat to cap or seal the white base coat of Marbalon in order to hinder its staining characteristics. This new top coat was based on laboratory testing rather than extensive field testing. Due to the difficulty of applying the clear top coat over an extremely white base coat, new types of stains occurred where the top coat was missed or applied too heavily. Mattingly advised Farboil of these problems, and was told by Farboil that the problems were due to Mattingly's application methods. Farboil further advised plaintiffs that by the fall of 1975 they would be marketing a stain removal product to correct the problem. The new stain remover was delivered to Mattingly in September 1975, but failed to perform satisfactorily.

In November 1975, Farboil's salesman John Holman discussed a financial settlement whereby Farboil would help Mattingly with its warranty expenses. Holman falsely represented that no other Farboil customers were having problems with the top coat or the staining. Farboil did subsequently agree, however, to extend a $3,500 credit to Mattingly to cover warranty expenses and to provide further technical assistance regarding application of Marbalon.

In July 1976, Mattingly and Farboil met to discuss further complaints regarding the pool coatings. In reliance on Farboil's promises of a new pigmented top coat which would be easier to apply and its representations that no other customers were having problems, Mattingly agreed to a $4,000 credit "in full and final payment" for all recoating jobs, signed on August 3, 1976.

In the fall of 1976, Mattingly began to use the tinted top coat. Farboil's representatives orally advised plaintiffs that the product could be used alone for recoating Marbalon, despite representations in the technical data sheet that the top coat could only be applied over a freshly coated base coat. The tinted top coat clogged the spray guns recommended by Beatrice for its application and developed yellow stains when applied on new pools.

By the end of 1977, Mattingly Pools, Inc. ceased operations, and subsequently entered into involuntary bankruptcy. Mattingly, Inc. ceased operations in 1978. Both companies sued Beatrice for damages. After a bench trial, Judge Patrick Kelly concluded that the Marbalon coating was "inherently defective due to its excessive staining characteristics" and its tendency to chip. Judge Kelly further concluded that Farboil would have discovered these problems had it engaged in any field testing, and that Farboil was guilty of inducing sales through fraudulent misrepresentation. The Judge set aside the August 3, 1976 accord and satisfaction on grounds of fraud, and awarded Mattingly $1,618,308.37 compensatory and $1,000,000 punitive damages for breach of express warranty and fraudulent misrepresentation. (The court rejected plaintiffs' claims for negligent manufacture and breach of implied warranty.) In awarding punitive damages, Judge Kelly expressly relied on Kansas law holding that punitive damages may be assessed against a corporation for its agents' acts only when corporate management has directed or ratified the acts.

### Collateral Estoppel

■ Affiliated has premised its motion for summary judgment on the arguments that (1) Beatrice is collaterally estopped from denying that the damages suffered by Mattingly were the reasonably foreseeable consequences of its misconduct, and (2) the insurance policy explicitly does not extend to foreseeable injuries. Beatrice properly points out, however, that issue preclusion is improper in this case. The intent issue regarding the policy is distinct from that determined in *Mattingly*. According to Beatrice, the *Mattingly* court found that

Beatrice intentionally misrepresented the qualities of its pool coating and that the damages to Farboil were the foreseeable results of the defects in the products. The *Mattingly* court nowhere found, however, that Beatrice either "intended or expected" the damages to Mattingly. The court agrees.

Despite the difference of issues between *Mattingly* and the present action, however, Beatrice apparently concedes that it may not relitigate the specific facts found against it in *Mattingly,* and relies instead on its interpretation of the contract in determining whether or not it is liable for the damages assessed in that case. Accordingly, because the facts underlying *Mattingly* may no longer be disputed, and because the construction of an insurance contract is a matter of law, *Scott v. Instant Parking, Inc.,* 150 Ill.App.2d 133, 245 N.E.2d 124, 126 (1st Dist.1969), the court will consider whether the compensatory damages awarded in *Mattingly* are unrecoverable as a matter of law.

### Policy Language

In the policy, Affiliated has obliged itself to indemnify Beatrice for liability assessed against Beatrice due to an "accident ... [which] results in personal injury or property damage neither expected nor intended from the standpoint of the insured." This language is common in Illinois insurance contracts and has been construed to exclude more than intentional injuries:

> [T]hese two words "intended" and "expected" cannot be treated as synonymous.... Even where the damages are not accomplished by design or plan (not intended), they may be of such a nature that they should have been reasonably anticipated (expected) by the insured.

*Aetna Casualty & Surety Co. v. Freyer,* 89 Ill.App.3d 617, 44 Ill.Dec. 791, 793, 411 N.E.2d 1157, 1159 (1st Dist.1980). *See also Bay State Insurance Co. v. Wilson,* 96 Ill.2d 487, 71 Ill.Dec. 726, 729, 451 N.E.2d 880, 883 (1983) (injuries which should have been reasonably anticipated by the insured

are "expected" within the meaning of insurance policy).

Whether or not damages are "reasonably anticipated" or "expected" within the meaning of a policy clause like the one at issue here has been judged by a subjective rather than objective standard. *Aetna Casualty & Surety Co. v. Dichtl,* 78 Ill. App.3d 970, 34 Ill.Dec. 759, 765, 398 N.E.2d 582, 588 (2d Dist.1980). In *Dichtl,* for example, an insanity acquittee who had killed her husband was eligible for indemnity as to damages arising in a civil action for wrongful death. The *Dichtl* court gave particular stress to the words "from the standpoint of the insured" and held that the insured's incapacity to form a wrongful intent at the time of the killing took the alleged murder out of the exclusion. Similarly, in *Bay State Insurance Co. v. Wilson,* 96 Ill.2d 487, 71 Ill.Dec. 726, 451 N.E.2d 880 (1983) the Illinois Supreme Court distinguished between cases where the injury is the "unintended result of an intentional act" and those injuries which are the "expected" result of an intentional act, 71 Ill.Dec. at 728, 451 N.E.2d at 882, and found the exclusionary clause triggered where the insured was "consciously aware that defendant's injuries were practically certain to be caused by his conduct...." *Id.* 71 Ill.Dec. at 729, at 883.

■ Applying a subjective standard to the expected damage issue is consonant with the purpose of such clauses, namely, to prevent the insured from consciously controlling the risks covered by the policy. *See Aetna Casualty & Surety Co. v. Freyer,* 89 Ill.App.3d 617, 620, 44 Ill.Dec. 791, 411 N.E.2d 1157, (1st Dist.1980). Therefore, although it is well settled that contracts of insurance should not be construed to indemnify a person for damages resulting from his own intentional misconduct, *Solo Cup Co. v. Federal Insurance Co.,* 619 F.2d 1178, 1187 (7th Cir.), *cert. denied,* 449 U.S. 1033, 101 S.Ct. 608, 66 L.Ed.2d 495 (1980), courts have generally applied this rule "only where contracts were argued to extend coverage to the knowledgeable and intentional, or the criminal wrongdoer."

*Id. See also Hartford Life Insurance Co. v. Title Guarantee Co.*, 520 F.2d 1170, 1175 (D.C.Cir.1975) (only for intentional wrongdoer can insurance contract be voided as against public policy).

The case which best supports Affiliated's position is *Industrial Sugars, Inc. v. Standard Accident Insurance Co.*, 338 F.2d 673 (7th Cir.1964). That case concerned a manufacturer of liquid sugar who by mistake used ten times the proper amount of chlorine in sterilizing its sugar processing equipment. Deliveries were made to three customers, including the Taylorville Pepsi-Cola Bottling Co. When the two other customers complained of an off-taste, Industrial learned that the sugar was contaminated but decided not to notify Taylorville. Taylorville subsequently discovered the contamination and refused to pay the purchase price of the sugar. When Industrial sued, Taylorville counterclaimed for damages, and Industrial requested Standard to defend it against the counterclaim. Standard refused, and Industrial brought a diversity action alleging that Standard had breached its duty to defend.

The Seventh Circuit reversed a judgment in favor of the insured, holding that whether or not the contamination constituted an "accident" within the meaning of the insurance policy, the proximate cause of the damages was Industrial's conduct "in deliberately withholding from Taylorville the knowledge [it] had of contamination of its sugar." *Id.* at 675. The Court held that such "deliberate risk of harm [was] not within the terms of the policy," *id.*, and noted that contracts of insurance against one's deliberate misconduct are in any event void as against public policy. *Id.* at 676.

On May 24, 1984, this court requested the parties to submit further memoranda on the analogies between *Industrial Sugars* and the instant case. Having reviewed those memoranda, the court concludes that the factual similarities are not sufficiently compelling to justify an award of summary judgment on the present record. In *Industrial Sugars*, the manufacturer's plant superintendent and highest officers knew that identical batches of sugar delivered to two other customers were contaminated, but deliberately withheld this information from the third customer on the "chance that the contamination would not be discovered." *Id.* at 676.

In *Mattingly*, Judge Kelly found a similar pattern of behavior in that Farboil's representatives deliberately withheld from Mattingly the fact that other Farboil customers were having problems. Judge Kelly at no point found, however, that Farboil *knew* its pool coating was incurably defective, as was the case in *Industrial Sugars*. Rather, Farboil continued to sell its pool coating "in the hope of somehow correcting the problems." *Mattingly* slip op. at 77. In other words, Farboil did not take a gamble that known defects in its product would go unnoticed, but instead took the gamble that an inadequately tested product would nonetheless prove marketable and that any defects manifested in practice could be easily remedied. Unlike the situation in *Industrial Sugars*, Judge Kelly's findings in *Mattingly* are arguably consistent with a belief on Farboil's part that it was selling a good product, and do not necessarily fit the situation where an insured is consciously aware that damages are almost certain to result from his misconduct. *Compare Wilson*, 71 Ill.Dec. at 729, 451 N.E.2d at 883.

In delineating these factual differences, the court addresses only the sufficiency of the record for summary judgment purposes and expresses no opinion as to whether Affiliated's present argument would succeed after a full trial on the merits. Judge Kelly found that Farboil misrepresented the degree of testing given Marbalon and the uniqueness (or lack thereof) of Mattingly's problems with the product. Beatrice has argued that these misrepresentations were "collateral" to the defects in its pool coating that directly caused property damage and related only to the inducement of the sale. A jury or other trier of fact might reasonably conclude, however, that some or all of Mattingly's damages resulted from Farboil's

misrepresentations instead of from the product defects. Alternatively, a reasonable fact-finder might conclude that at some point in their dealings with each other Farboil became "consciously aware that [Mattingly's] injuries were practically certain to be caused" from its continued use of Marbalon. *Wilson,* 71 Ill.Dec. at 729, 451 N.E.2d at 883. Neither inquiry is appropriate for summary judgment on the present record.

### Punitive Damages

Affiliated has secondly requested a declaration that the $1,000,000 punitive damages awarded in *Mattingly* are neither covered by Affiliated's policy nor recoverable as a matter of public policy. Affiliated relies chiefly on *Beaver v. Country Mutual Insurance Co.,* 95 Ill.App.3d 1122, 51 Ill.Dec. 500, 420 N.E.2d 1098 (5th Dist. 1981), in which the Illinois Appellate Court held that public policy prohibits insurance against liability for punitive damages that arise out of an insured's own misconduct. Beatrice, in contrast, relies on *Scott v. Instant Parking, Inc.,* 105 Ill.App.2d 133, 245 N.E.2d 124 (1st Dist.1969), in which the court held that a policy insuring a corporation against damages (including punitive damages) caused by the misconduct of its agents was not against public policy.

*Scott* suggests that, as a matter of contract construction, the phrase "all sums which insured becomes legally obligated to pay as damages," absent any exclusionary clause should be construed to encompass punitive as well as compensatory damages. 245 N.E.2d at 126. In *Scott,* the Court held that ordinary accident policies cover injuries covered by willful and wanton misconduct, since the question of accident is determined "from the standpoint of the injured person and not from the standpoint of the aggressor." *Id.* at 125. Unlike the policy in *Scott,* however, Affiliated's policy defines accidents "from the standpoint of the insured." As noted in *Aetna Casualty & Surety Co. v. Dichtl,* 78 Ill.App.3d 970, 34 Ill.Dec. 759, 766, 398 N.E.2d 982, 988 (2d Dist.1980), this language was adopted by

Illinois insurers to protect themselves from the holding in *Scott,* and to exclude from liability insurance coverage damages wantonly or willfully inflicted.

■ As discussed earlier, this shift in policy language is addressed to the subjective awareness of risk on the part of the insured, and not to the kind of damages imposed. Had Affiliated intended to exclude punitive damages, it could have expressly said so. The court therefore cannot interpret Affiliated's policy as categorically prohibiting indemnification for punitive damages. Indeed, even were the court to follow Affiliated's construction, the matter properly could not be decided on summary judgment, since Beatrice contends that Affiliated's sales agents expressly represented to Beatrice that the policy covered punitive damages where legally permissible, raising possible estoppel questions. Accordingly, the court turns to the issue whether such insurance is legally permissible on public policy grounds.

In *Scott,* the Illinois Appellate Court rejected the insurer's argument that insurance against punitive damages was against public policy where the case involved "only the right of a corporation to insure against liability caused by its agents and servants." 245 N.E.2d at 126. Subsequently, in *Beaver v. Country Mutual Insurance Co.,* 95 Ill.App.3d 1122, 51 Ill.Dec. 500, 420 N.E.2d 1058 (5th Dist.1981), the Appellate Court from the Fifth District reasoned that the policies underlying the imposition of punitive damages in Illinois—namely to punish and deter—would be undermined if the party guilty of misconduct were allowed to "shift that burden to an insurance company." 51 Ill.Dec. at 502, 420 N.E.2d at 1060 (quoting *Northwestern National Casualty Co. v. McNulty,* 307 F.2d 432, 440 (5th Cir.1962)). The *Beaver* court nonetheless stated that its holding in no way affected the rule established in *Scott* where punitive damages were sought against an employer on grounds of vicarious liability. Quoting *McNulty* again, the Court reasoned that "if the employer did not participate in the wrong the policy of preventing the wrong-

doer from escaping the penalties for his wrong is inapplicable." 51 Ill.Dec. at 503, 420 N.E.2d at 1061 (quoting 307 F.2d at 439). Since there was in *Scott* "no indication that the employer had in any way, directly or indirectly, participated in the wrongful conduct of the employee for which punitive damages were assessed," 420 N.E.2d at 1061, the *Beaver* court found no conflict of principle between its resolution and that in *Scott.*

In some respects, *Beaver* appears to be but a variant on the rule prohibiting insurance against damages resulting from an insured's intentional or wanton misconduct. The court noted that the "line prohibiting the protection of insurance is drawn ... between negligent conduct and the kind of unintentional conduct for which punitive damages may be imposed." 51 Ill.Dec. at 502, 420 N.E.2d at 1060. That latter category of conduct was in turn defined as "malicious wrongdoing" or action with such a "conscious disregard of others ... that the wrong partakes of a criminal character." *Id.*, quoting *McNulty*, 307 F.2d at 442. As noted earlier, whether Beatrice did act with such a disregard for Mattingly's injuries is not clear. At the same time, however, the *Beaver* opinion relied heavily on the function and purpose of punitive damage awards in finding their insurability to be against public policy, and Judge Kelly expressly relied on Beatrice's "wanton" misconduct in imposing a punitive award. Slip op. at 73. The court therefore concludes that the present issue is appropriate for summary judgment, and addresses whether the punitive damages awarded against Beatrice are recoverable under the rule of *Scott* allowing indemnification for such damages when vicariously imposed.

In *Mattingly*, Judge Kelly imposed punitive damages to punish Beatrice's deliberate misconduct in marketing Marbalon without adequate testing and in denying Marbalon's defects in the hope that companies like Mattingly would not "question the quality of a product backed by a commercial giant like Beatrice Foods." Slip op. at 76. Judge Kelly also emphasized Beatrice's numerous misrepresentations both in its dealings with Mattingly and in its general ad campaign. Since Kansas law specifically prohibits punitive damage awards against a corporation on vicarious liability grounds, *Mattingly*, slip op. at 74, Judge Kelly necessarily found that Farboil management directed and/or ratified the above wrongful acts. These findings, unless reversed on appeal, estop Beatrice from denying that it "participated in the wrongful conduct of the employee for which punitive damages were assessed." *Beaver*, 51 Ill.Dec. at 503, 420 N.E.2d at 1061. The court therefore finds that *Beaver* rather than *Scott* is controlling.

Beatrice has correctly noted that the present case involves a situation different from either *Scott* or *Beaver* in that punitive damages were assessed against Beatrice not for its own intentional misconduct but for its complicity with the misconduct of its agents. *Beaver* is expressly not limited to intentional conduct, however, 51 Ill. Dec. at 502, 420 N.E.2d at 1060, and Beatrice has cited no Illinois law which indicates that an Illinois state trial court might limit *Beaver* to its facts or otherwise ignore the bright line rule by which the *Beaver* court distinguished *Scott*, i.e., that the employer in *Scott* had in no way "participated in the wrongful conduct ... for which punitive damages were assessed." 51 Ill.Dec. at 503, 420 N.E.2d at 1061.

Beatrice's citation of dictum in Justice Sullivan's concurring opinion in *Froud v. Celotex Corp.*, 107 Ill.App.3d 654, 660, 63 Ill.Dec. 261, 266, 437 N.E.2d 910, 915 (1st Dist.1982), *rev'd*, 98 Ill.2d 324, 74 Ill. Dec. 629, 456 N.E.2d 131 (1983), is not to the contrary. In that case, Justice Sullivan did not repudiate *Beaver* but merely emphasized that the "possible unavailability of liability insurance" is a factor in determining the appropriate size of a punitive damages award. *Id.* In *Mattingly*, Judge Kelly expressly considered Beatrice's current profits and net worth in determining what size punitive damages award would serve as an incentive for responsible behavior and would be reasonable and modest.

Slip op. at 78. If Beatrice were allowed to shift those damages to Affiliated, then the deterrent purpose of that punitive award would be seriously undermined. The court therefore concludes that the punitive damages awarded against Beatrice in the *Mattingly* case are unrecoverable as a matter of Illinois law.

### Conclusion

Plaintiff's motion for summary judgment is denied as to the compensatory damages, but granted as to the punitive damages. The case is set for status on March 15, 1985, at 9:30 a.m.

It is so ordered.