**U.S. FIRE INSURANCE CO., Plaintiff,**

v.

**BELTMANN NORTH AMERICAN CO., INC. and James J. Cash, Defendants.**

**No. 88C1697.**

United States District Court, N.D. Illinois, E.D.

Aug. 31, 1988.

Kathleen A. McQueeny, Hinshaw, Culbertson, Moelmann, Hoban, & Fuller, Chicago, Ill., for plaintiff.

William T. Coleman, Susan McLanglotz, Hedberg, Tobin, Flaherty & Whalen, Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

U.S. Fire Insurance Company ("U.S. Fire") seeks a declaration that an insurance policy it issued to Beltmann North American Co., Inc. ("Beltmann") does not provide coverage for claims made against Beltmann by its ex-employee James Cash ("Cash").[1] Beltmann has counterclaimed for a declaration to the opposite effect.

With the parties thus at issue, U.S. Fire has moved for judgment on the pleadings under Fed.R.Civ.P. ("Rule") 12(c).[2] This memorandum opinion and order does declare the rights and obligations of the litigants—but not in the manner for which U.S. Fire contends.

### Background and Procedural History

U.S. Fire issued its Commercial Umbrella Policy No. 523–3362366 (the "Policy") to Beltmann, providing one year's coverage

---

1. U.S. Fire originally brought its Complaint as Case No. 88 CH 706 in the Chancery Division of the Circuit Court of Cook County. Beltmann remanded the case to this District Court because (1) Beltmann is not an Illinois citizen, (2) there is complete diversity of citizenship and (3) the amount in controversy exclusive of interest and costs exceeds $10,000.

2. Judgment on the pleadings is appropriate when the admitted facts show the movant is entitled to judgment as a matter of law (2A *Moore's Federal Practice* ¶ 12–15, at 12–106 (2d ed. 1987)). Beltmann's Answer admits all factual allegations of the Complaint, denying only the legal conclusions proposed by U.S. Fire. That allows a final resolution of the controversy now, though only U.S. Fire's motion has triggered this opinion.

beginning August 1, 1984. In January 1986 Cash sued Beltmann in the "Cash Action" (Case No. 86 C 674 in this District Court), alleging Beltmann had discharged him July 8, 1985 in retaliation for his refusal to participate in a scheme to defraud the State of Illinois. Cash's Complaint sets out three charges in separate counts alleging:

1. retaliatory discharge (a tort claim);

2. breach of a contractual duty to treat employees fairly; and

3. failure to pay back wages and benefits due under the Illinois Wage Payment and Collection Act.

Beltmann tendered defense of the Cash Action to U.S. Fire, which has been defending under a reservation of rights.

U.S. Fire here seeks a declaration that it has (1) no duty to defend the Cash Action and (2) no duty to indemnify Beltmann for any liability ultimately imposed in the Cash Action. It asserts three reasons for noncoverage:

1. Cash's claims, as asserted in the Cash Action, do not fall within the Policy definitions of either "personal injury" liability or "bodily injury" liability.[3]

2. Even if Cash's claims would otherwise fall within the Policy's coverage, they did not arise from an "occurrence" as defined in the Policy.

3. Even if the first two hurdles were surmounted, Illinois public policy forbids insurance coverage of Beltmann's liability for Cash's claims.

Beltmann denies each of those contentions and counterclaims for a declaration that coverage is provided.

Opinion at 3–6 held (1) Minnesota law applies in interpreting the Policy but (2) if Illinois public policy were to prohibit insurance for the Cash claims, that prohibition would override the Policy. In addition the Opinion called for further briefing on four issues:

1. Whether U.S. Fire had abandoned its claim for a declaration as to its responsibility for defense costs, thereby raising jurisdictional ("case or controversy") problems.

2. Whether Cash Action Counts II and III fell within any of the coverages provided by the Policy.

3. Whether Cash would have to prove "actual malice" to prevail on his retaliatory discharge claim, in which event that claim would not fall within the Policy's coverage.

4. Whether Cash, in order to prevail, would have to prove Beltmann had engaged in conduct for which Illinois would not allow it to obtain insurance.

With the second of those issues having received an agreed negative answer from the parties,[4] this opinion proceeds to treat with the other three.

## Jurisdiction

■ There may be one thing worse than losing a lawsuit: Winning the lawsuit, then learning that the court deciding the case had no jurisdiction to do so, so that the losing party gets to try again (see, e.g., *Newman Green, Inc. v. Alfonzo Larrain R.*, 854 F.2d 916 (7th Cir.1988) (en banc)). That is only one reason for the salutary

---

3. As described below, on June 14, 1988 this Court issued the "Opinion," requesting supplemental briefing on a number of issues. Beltmann Supp.Mem. 6 n. 1 then conceded that Cash's claims do not fall within the Policy's definition of "bodily injury." Meanwhile, U.S. Fire Supp.Mem. 8–10 had proceeded to set out reasons for reaching that same conclusion, and when U.S. Fire's counsel later filed a revised copy of that Supplemental Memorandum (making some corrections), they failed to pick up the concession that had been made by Beltmann. By the time the parties had filed their supplemental reply memoranda, however, they had agreed the issue was not in dispute. As for the two other types of Policy coverage ("advertising liability" and "property damage" liability), those clearly do not apply to Cash's claims.

4. Beltmann Supp.Mem. 6 has admitted that Cash Action Counts II and III are not covered by the Policy. U.S. Fire Supp.Mem. 12–14 argued to precisely the same effect. But U.S. Fire's proffered rationale for that position was so flimsy (in part because it required that U.S. Fire first had to win the retaliatory discharge issues) that this Court half expected Beltmann to seek to withdraw its concession. Nonetheless Beltmann wisely adhered to its concession—there are obvious arguments, though U.S. Fire has not made them, that make those claims noncovered. Accordingly the issue, like that in n. 3, is out of the case.

principle that the first thing a District Court should do is determine that it has jurisdiction (*Wisconsin Knife Works v. National Metal Crafters*, 781 F.2d 1280, 1282 (7th Cir.1986)).

Opinion at 6–9 sought additional briefing on the jurisdictional issue because it then appeared that U.S. Fire may have abandoned its claim for a declaration that it had no duty to defend the Cash Action, in which event there would be no live controversy between the parties. U.S. Fire and Beltmann have correctly agreed otherwise, however, because under U.S. Fire's reservation of rights it may stop defending Beltmann if it obtains a favorable ruling in this action (*Country Mutual Insurance Co. v. Murray*, 97 Ill.App.2d 61, 73, 239 N.E.2d 498, 505 (2d Dist.1968)). Liability for defense costs [5] is of course entirely independent of liability for Cash's claims, and those costs will be borne by U.S. Fire or Beltmann (depending on the decision here) whether or not Cash is successful.

That means there is an actual controversy between U.S. Fire and Beltmann, which can and should be resolved regardless of the outcome of the Cash Action. And that in turn obviates any jurisdictional "case or controversy" problem on that score.

### *Policy Coverage*

■ Under the Policy, U.S. Fire provides coverage only for liability arising from an "occurrence," which is defined to exclude "an offense committed with actual malice." Hence U.S. Fire is entitled to obtain the declaration of noncoverage it seeks here if Cash *must* show Beltmann acted with "actual malice" in order to prevail on his retaliatory discharge claim.[6]

---

5. That term is used here not as a term of art (that is, not as taxable "costs" defined in 28 U.S.C. § 1920) but as a generic term for expenses incurred in defending the Cash Action.

6. If Cash can prevail either with a showing of "actual malice" or with a lesser showing that comes within the Policy's coverage, U.S. Fire must continue to provide defense costs pending resolution of the Cash Action. Thus U.S. Fire would not be entitled to a declaration of *total* noncoverage in that event.

Because "actual malice" is undefined in the Policy, this Court must look elsewhere for its meaning. U.S. Fire cites to a number of Illinois and Minnesota cases discussing the concept of "malice". While the opinions' language varies, the core meaning they ascribe to the term is expressed by the Supreme Court of Minnesota as "the intentional doing of a harmful act without legal justification" (*Cherne Industrial, Inc. v. Grounds & Associates, Inc.*, 278 N.W.2d 81, 95 (Minn.1979)).

But the Policy does not use the term "malice" alone. It speaks instead of "actual malice," a concept that has always carried a different and more restricted meaning. Moreover, as a matter of straightforward contract construction "actual malice" must be more limited than U.S. Fire claims:

1. "Personal injury" is defined in the Policy as "injury, such as but not limited to libel, slander, defamation of character, discrimination, false arrest, false imprisonment, wrongful eviction, wrongful detention, malicious prosecution or humiliation...."

2. Most (if not all) of those listed torts—and by implication most torts included under principles of ejusdem generis—involve "the intentional doing of a harmful act without legal justification."

3. Surely the exclusion of "offense[s] committed with actual malice" is intended to limit coverage in some way, else the language would be useless surplusage. But equally surely that exclusion cannot reasonably be read to wipe out the entire coverage for personal injury liability provided by the Policy. Nor would it be reasonable (or sensible) even to read the exclusion to eliminate coverage for any one of the listed torts altogether, else why list the tort at all?[7]

---

7. This last observation means "actual malice" must necessarily denote more than "malice" alone. After all, the Policy specifically covers liability for malicious prosecution. If the exclusion for "actual malice" were equivalent to a "malice" exclusion, it would make no sense to include that tort in the coverage in the first place.

This Court's research has found no Minnesota decision interpreting the term "actual malice" in an insurance policy. In general usage, the phrase has many meanings. For example, as a term of art in the law of defamation, actual malice can mean either:

1. the constitutional malice standard of knowing falsity or reckless disregard for truth or falsity, as set out in *New York Times Co. v. Sullivan*, 376 U.S. 254, 280, 84 S.Ct. 710, 726, 11 L.Ed.2d 686 (1964) or

2. the common law requirement that a plaintiff must show "actual ill will, or a design causelessly and wantonly to injure plaintiff" (*Frankson v. Design Space International*, 394 N.W.2d 140, 144 (Minn.1986), quoting *McBride v. Sears, Roebuck & Co.*, 306 Minn. 93, 98, 235 N.W.2d 371, 375 (1975)) in order to overcome a defendant's conditional privilege.

But it would not make sense to read the Policy's reference to actual malice as applying only to defamation, merely because the defamation torts are included among those covered by "personal injury" liability coverage. That would be an extraordinarily crabbed reading of the Policy.

Black's Law Dictionary 863 (5th ed. 1979) defines "actual malice" or "malice in fact" as "imply[ing] desire or intent to injure, while 'malice in law,' or 'implied malice,' means wrongful act done intentionally, without just cause or excuse...." That "malice in fact" meaning, very similar to the sense of "actual malice" in the common law of defamation, arises in several torts, in each instance playing a role similar to the one it occupies in the law of defamation. For example, attorneys are said to be conditionally privileged to interfere, on behalf of their clients, with the clients' contracts with third parties unless they act with actual malice (e.g., *Schott v. Glover*,

109 Ill.App.3d 230, 235, 64 Ill.Dec. 824, 827–28, 440 N.E.2d 376, 379–80 (1st Dist. 1982), defining that term as a desire to harm the third party independent of the desire to help the client; accord, *Miller v. St. Charles Condominium Association*, 141 Ill.App.3d 834, 838, 96 Ill.Dec. 311, 314, 491 N.E.2d 125, 128 (2d Dist.1986)). To like effect, in Minnesota punitive damages may be imposed on a showing of "willful indifference to the rights or safety of others" (Minn.Stat. § 549.20, subd. 1 (1986))—a standard the Minnesota Supreme Court has referred to in passing as "actual malice" (*Becker v. Alloy Hardfacing & Engineering Co.*, 401 N.W.2d 655, 659 (Minn.1987)).

In a diversity action, this Court in effect sits as an Illinois trial court. Here that means the application of Minnesota substantive law, to which Illinois' choice-of-law rules direct us (Opinion at 5). That calls on this Court to try to guess what an Illinois court would declare the law of Minnesota to be on an issue of contract interpretation never addressed by the courts of Minnesota![8] In that posture, little if anything can be said with any degree of certainty. Yet the effort must be made.

It seems likely that Minnesota courts would interpret the term "actual malice" in the Policy to mean something like "a desire or intent to injure, apart from the actor's intent to protect its own interests." But the precise formulation is not important. As will be shown, even if the "willful indifference" standard of the Minnesota punitive damages statute is used, U.S. Fire cannot prevail in this action.

U.S. Fire can win this case outright only if Cash *must* show "actual malice" (however defined) in order to prevail (see n. 6). But the tort of retaliatory discharge contains no state-of-mind requirement. True enough, the label "retaliatory" suggests some sort of animus, or tit-for-tat motiva-

---

**8.** This is but another illustration of the bizarre effects of *Erie v. Tompkins* and its constitutionally dubious (to say the least) inversion of the Supremacy Clause. By contrast, the *Swift v. Tyson* concept of a federal common law is not only wholly consistent with the Constitution but, under a rational approach to the Supremacy Clause, would create a unifying jurispruden-

tial force. See this Court's prior discussions in such cases as *Zick v. Verson Allsteel Press Co.*, 623 F.Supp. 927, 930 nn. 6 & 7 (N.D.Ill.1985) and *Abbott Laboratories v. Granite State Insurance Co.*, 573 F.Supp. 193, 196 & n. 2 (N.D.Ill. 1983), and see, at much greater length, the seminal treatment of the issues in Professor Crosskey's monumental work cited there.

tion, on the part of the employer. And it seems obvious that in many cases an intent to injure the employee will be present. However, this Court has found no Illinois case requiring that the employee prove the employer acted with such an intent.[9]

*Hinthorn v. Roland's of Bloomington, Inc.*, 119 Ill.2d 526, 529, 116 Ill.Dec. 694, 696, 519 N.E.2d 909, 911 (1988) identifies the elements of the tort:

> A plaintiff states a valid claim for retaliatory discharge only if she alleges that she was (1) discharged; (2) in retaliation for her activities; and (3) that the discharge violates a clear mandate of public policy.

Only the second element carries the potential for a state-of-mind requirement. But *Hinthorn* suggests no such component, but simply the familiar need for a proximate cause showing (*id.* at 532, 519 N.E.2d at 912):

> This element basically requires that plaintiff allege the causal relationship between the employee's activities and the discharge.[10]

It is plain that proving such a causal relationship does not necessarily entail showing an intent to injure the employee.

*Beckman v. Freeman United Coal Mining Co.*, 123 Ill.2d 281, 287, 122 Ill.Dec. 805, 807, 527 N.E.2d 303, 305 (1988) has very recently provided a slightly different formulation from that provided earlier this year in *Hinthorn:*

> For a plaintiff to establish a prima facie case for retaliatory discharge, he must (a) establish that he exercised a statutory or constitutional right, (b) that he was discharged because of his activity, and (c) that defendant's conduct was motivated by unlawful considerations.

That third element of "unlawful considerations" having motivated the discharge is not at all the same as a showing of intent to injure the employee. Indeed, quite different "unlawful considerations" have been at the forefront of the concerns of Illinois courts as they have fashioned the tort.

Most reported Illinois retaliatory discharge cases to date have involved retaliation for an employee filing a workers' compensation claim. While such retaliation might on occasion be motivated by animus toward the employee for having imposed a cost on the employer, it would seem at least as likely that the employer's animus (if that is the right label at all) would be directed toward the *act* of filing the claim—motivated by the employer's interest in avoiding future claims by the employee or in deterring claims by other employees. Certainly the Illinois General Assembly, in enacting an anti-retaliatory prohibition in the Workers' Compensation Act (Ill.Rev.Stat. ch. 48, ¶ 138.4(h)), was concerned with the latter types of considerations rather than one-on-one animus.

In that respect, nothing in the Illinois cases suggests the employee must show the employer was motivated by ill will rather than its own self-interest. Instead, the "unlawful consideration" that has concerned the Illinois Supreme Court has been that of deterring future claims and *not* of wreaking vengeance on an employee. Indeed, *Darnell v. Impact Industries, Inc.*, 105 Ill.2d 158, 161–62, 85 Ill.Dec. 336, 338, 473 N.E.2d 935, 937 (1984) held an employee stated a cause of action for retaliatory discharge for filing a workers' compensation claim against a *former* employer. In such a case it would be odd to characterize the employer's retaliatory motivation as re-

---

**9.** At this point in the analysis, of course, attention shifts to what Cash must prove under Illinois substantive law to win his lawsuit, for his claim is made under Illinois law. When that is determined, it may be compared with "actual malice" under the Policy (as has been said, a function of Minnesota law).

**10.** [Footnote by this Court] *Midgett v. Sackett–Chicago, Inc.*, 105 Ill.2d 143, 149, 85 Ill.Dec. 475, 478, 473 N.E.2d 1280, 1283 (1984) refers to a retaliatory discharge as "vengeful." However,

the Court was there describing the argument of one party, rather than enunciating an element of the claim. In contrast, *Palmateer v. International Harvester Co.*, 85 Ill.2d 124, 134, 421 N.E. 2d 876, 880–81 (1981) flatly rejected the employer's argument that the employee must show an "adversarial relationship" between employer and employee to have a valid claim. Instead the Supreme Court said "[a]ll that is required" are the elements identified earlier in this paragraph of the text.

flecting a sense of ill will toward the employee as a person.[11]

It therefore cannot now be determined whether the Policy covers the Cash retaliatory discharge claim. While it will be possible to decide at trial of that claim whether Beltmann did (or did not) act with "actual malice," that issue is both unknown and unknowable in advance of trial. In the interim the Cash claim makes allegations that *could* fall within the Policy's coverage, so U.S. Fire must continue to pay Beltmann's defense costs.[12]

### Illinois Public Policy

■ U.S. Fire also asserts that if the Policy does provide insurance for retaliatory discharge, such coverage is prohibited under the Illinois public policy against indemnification for wilful misconduct (see generally *Davis v. Commonwealth Edison Co.*, 61 Ill.2d 494, 500–01, 336 N.E.2d 881, 885 (1975)). In that respect U.S. Fire relies most heavily on *Rubenstein Lumber Co. v. Aetna Life and Casualty Co.*, 122 Ill. App.3d 717, 719, 78 Ill.Dec. 541, 543, 462 N.E.2d 660, 662 (1st Dist.1984)). After the Illinois Appellate Court there held Aetna's insurance policy did not cover the retaliatory discharge claim against Rubenstein,[13] the opinion then moved on to this dictum (*id.*):

> Moreover, even if the policy was written to expressly require defendant to defend and indemnify plaintiff in the retaliatory discharge action, we believe that such a provision would be void as against public policy, for it would be an attempt to indemnify and insure the company for damages resulting from its voluntary misconduct. An agreement to indemnify or insure against one's voluntary, not accidental, misconduct is against public policy and unenforceable. *See Davis v. Commonwealth Edison Co.*, 61 Ill.2d 494, 500–01, 336 N.E.2d 881, 885 (1975).

Were that passage necessary to the *Rubenstein* decision, this Court would be bound to follow its reading of Illinois law [14] despite its truncated and conclusory discussion of a difficult issue.[15] But the state-

---

**11.** Another frequent setting for retaliatory discharge claims (as in *Palmateer*) is the employee's tipping off the authorities as to some suspected criminal activity by the employer or its management. In those cases there is obvious potential for animus toward the employee. Cash's claim is a little different: He says he was fired for refusing to assist criminal activity, not for reporting such activity to the authorities. If that allegation states a claim under Illinois law (a question on which this Court offers no opinion), the alleged scenario suggests at least one potential non-retributory motive: the desire to replace Cash with someone more complaisant.

**12.** Neither side has addressed the questions involved in quantifying that obligation, given the now-established fact that two of Cash's claims are not even arguably within the Policy's coverage. Questions of allocation, dependent as they are on facts that are not only outside the pleadings here but also will shift from time to time during the course of the Cash Action, are outside the ambit of this case.

**13.** Nothing in that holding casts any doubt on the interpretation of the Policy involved in this opinion. Aetna was Rubenstein's workers' compensation insurer, so the policy there looked nothing like the umbrella policy at issue here.

**14.** This Court has frequently expressed its view of the real mandate of *Erie* in a situation where (as in Illinois) state law includes a substantive rule requiring trial courts to adhere to currently-viable intermediate appellate court decisions, even where a trial judge believes the state's highest court might reach a different decision if given the opportunity (e.g., *Rizzo v. Means Services, Inc.*, 632 F.Supp. 1115, 1131–33 (N.D.Ill. 1986); *Abbott Laboratories*, 573 F.Supp. at 196–200). But the very nature of the distinction between holdings and dicta (see *United States v. Crawley*, 837 F.2d 291 (7th Cir.1988)) explains why the rule in such cases as *People v. Thorpe*, 52 Ill.App.3d 576, 579, 10 Ill.Dec. 351, 354, 367 N.E.2d 960, 963 (2d Dist.1977) and *Garcia v. Hynes & Howes Real Estate, Inc.*, 29 Ill.App.3d 479, 482, 331 N.E.2d 634, 636 (3d Dist.1975) does not force Illinois trial courts to follow dicta from their own appellate courts. In turn, a federal district court is in no different (or lesser) position under *Erie*.

**15.** Indeed, the quoted *Rubenstein* language (which is the totality of the discussion in that case) recasts *Davis'* statement of Illinois law. *Davis*, 61 Ill.2d at 500, 336 N.E.2d at 885 noted the prohibition of indemnification against "wilful misconduct," a concept that differs in an important way from "voluntary, not accidental, misconduct" (as *Rubenstein* characterized the issue). As reflected in the extended discussion in Federal Criminal Jury Instructions of the Seventh Circuit 6.03 of the term "willful" (the spelling used there), it has been regularly construed to mean an act that is not only voluntary (as distinguished from accidental) but is also done:

ment *is* clearly dictum and need be considered only for its persuasiveness. Just as U.S. Fire errs in maintaining *Rubenstein* is controlling, so Beltmann errs in contending that U.S. Fire's position must fail simply because that case is *not* controlling. Clearly a more careful assessment of Illinois law is called for.

U.S. Fire does not develop its argument as to the noninsurability of retaliatory discharge claims (even though this Court had requested supplemental briefing on the subject). Instead it rests solely on the *Rubenstein* dictum. But as n. 15 reflects, *Rubenstein* itself somewhat mischaracterizes the *Davis* authority it cites. More importantly, the very passage from *Davis* to which *Rubenstein* (and therefore U.S. Fire) refers is simply not on point.

*Davis*, 61 Ill.2d at 500–01, 336 N.E.2d at 885 actually said:

> First, an agreement to indemnify against wilful misconduct would, as a general rule, be contrary to public policy and unenforceable. . . .

Apart from the acknowledgement of potential exceptions inherent in the "as a general rule" formulation, what is more critical is that the statement was made not in the context of insurance, but rather in speaking of an indemnification agreement between employer and employee. Plainly the public policy considerations in the two contexts differ widely.[16] This Court's research has found no Illinois authority suggesting the *Davis* public-policy concern is applied to liability insurance at all, let alone to an unequivocal policy affording such coverage (*Rubenstein*, it will be recalled, dealt

with a very different type of coverage— workers' compensation insurance).

Quite obviously there are some limits on what public policy will allow in the way of insurance coverage. As *Checkley v. Illinois Central R. Co.*, 257 Ill. 491, 496–97, 100 N.E. 942, 944 (1913) noted:

> A fire insurance policy issued to any one, which purported to insure his property against his own willful and intentional burning of the same, would manifestly be condemned by all courts as contrary to a sound public policy. . . .

That statement is probably as true today as it was 75 years ago (but see *Gulliver's East, Inc. v. California Union Insurance Co.*, 118 Ill.App.3d 589, 74 Ill.Dec. 234, 455 N.E.2d 264 (1st Dist.1983) for an example of how far Illinois courts will go in avoiding even that prohibition). Yet the public policy considerations that preclude insurance coverage for self-inflicted injury lose a great deal of their force in the context of insurance for tortious liability to innocent third parties. In that instance competing public policies are at work: favoring the insurer, the public policy against allowing intentional tortfeasors to shift liability to insurers; but favoring the insured, the public policy against permitting an informed contracting party with no inferiority in bargaining position (in this case, the insurer) to escape from its freely-entered-into contract, coupled with the public policy in favor of affording compensation to victims.

This Court has searched in vain for a single reported Illinois case holding liability insurance for intentional acts or intentional

---

with bad purpose, without justifiable excuse, without grounds for believing it was lawful, or with careless disregard whether or not one has the right so to act.

Though that discussion addresses criminal rather than civil usage, the same concept of something well beyond merely volitional activity applies with equal force in the civil context (see, e.g., IPI 2d (Civil) 14.01).

**16.** As between employer and employee, the usual view is that the former is most likely in a dominant position, able to dictate a contractual indemnification term that might not be acceptable if the employee had a full range of other

options available. Even though the situation does not qualify for duress treatment in the legal sense, and even thought he result may do violence to free market principles, the courts refuse to enforce the employer-dictated term against the employee. By contrast, to the extent the parties to an insurance contract are perceived as occupying unequal positions, it is most frequently the insurer that is viewed as having the upper hand. And even if that is not so in fact, it is the insurer that writes its own policies, and there should be no need for a court to intervene to protect the insurer against its own self-selected and self-drafted policy terms.

injuries void as against public policy.[17] To be sure, there is no directly contrary authority either. However, what indirect inferences may be drawn from the Illinois cases seem to indicate that insurance *is* allowed to cover at least *compensatory* damages flowing from intentional or willfully inflicted harms. That conclusion calls for a bit of explanation.

Illinois courts have faced with some frequency the question whether a party may obtain insurance against punitive damages. On that inquiry the answer seems to be "no,"[18] although there is an exception for employers vicariously liable for punitive damages occasioned by their employees' torts.[19]

Because Illinois law grants punitive damages only in the instance of "wanton and wilful" conduct, a rule of noninsurability of punitive damages might at first blush be thought to imply noninsurability of wanton and wilful conduct as well. Yet the cases say nothing of the sort. Instead, the decisions barring insurance against punitive damages reason that shifting responsibility for those damages defeats the primary function of punitive damages, to punish the wrongdoer (see, e.g., *Beaver*, 95 Ill.App.3d at 1123, 51 Ill.Dec. at 501–502, 420 N.E.2d at 1059–60). No mention whatever is made of any purported public policy barring insurance for wanton and wilful acts—rather the focus is on the type of damages. Indeed, there seems no question that the insurer *is* responsible for compensatory damages (assuming the policy covers them), even though such damages obviously flow from precisely the same conduct that justified the punitive award.[20]

In short, the cases offer no support for U.S. Fire's claimed public policy prohibition of insurance for the entire retaliatory discharge claim.[21] At least to the extent that claim seeks compensatory damages, the Policy potentially provides valid coverage.[22]

17. It might be speculated that the absence of authority is due to the insurers' tendency to avoid issuance of policies covering such conduct. That, however, tends to be refuted by the kinds of torts plainly covered by liability policies (including the one at issue here).

18. Even that statement may be too strong. See *Holda v. Kane County*, 88 Ill.App.3d 522, 43 Ill.Dec. 552, 410 N.E.2d 552 (2d Dist.1980), where Justice Lindberg and Presiding Justice Seidenfeld differed on whether the county's purchase of liability insurance served to waive its immunity for punitive damages. Although that dispute as such as not of any importance here, the Justices' very debate would make no sense (or would have been wholly unnecessary) if the insurance itself had been invalid as a matter of public policy.

19. See *Beaver v. Country Mutual Ins. Co.*, 95 Ill.App.3d 1122, 420 N.E.2d 1058 (5th Dist.1981); *Scott v. Instant Parking, Inc.*, 105 Ill.App.2d 133, 245 N.E.2d 124 (1st Dist.1969); *Affiliated FM Ins. Co. v. Beatrice Foods Co.*, 645 F.Supp. 298, 303–05 (N.D.Ill.1985).

20. For example, in *Beaver* the insurer contested the $5,000 punitive damages award but paid the much larger $30,000 compensatory judgment without objection. *Scott* is even more convincing. There the insurance company argued the policy did not cover the compensatory damages because they were caused by wilful and wanton misconduct. That position was rejected as a matter of contract interpretation, and the court ruled against the insurer without any discussion of a public policy barring such insurance (105 Ill.App.2d at 133–35, 245 N.E.2d at 125–26). *Scott's* only public policy discussion involved the punitive damage claim (*id.* at 137, 245 N.E.2d at 126.)

21. Cash seeks punitive as well as compensatory damages, so Illinois public policy may bar insurance for the former component unless an exception applies. While retaliatory discharge claims frequently entail punitive damages, they need not do so (e.g., *Boyles v. Greater Peoria Mass Transit District*, 113 Ill.2d 545, 555–56, 101 Ill.Dec. 847, 851, 499 N.E.2d 435, 439 (1986)). In any event:

    1. U.S. Fire must currently defend the whole retaliatory discharge claim even if its coverage extends only to the compensatory damages.

    2. It is wholly speculative whether Cash will ultimately prevail on his claim for punitive damages (or prevail at all).

As implied by the Opinion's request for briefing on the jurisdictional issue, there is no present case or controversy as to whether the claim for punitive damages falls within the Policy or is barred by Illinois public policy.

22. "Potentially" must be used here and in the conclusion to this opinion because coverage vel non will depend on whether the proof at trial of the retaliatory discharge claim establishes the "offense was committed with actual malice." Counsel in the Cash Action might well consider the desirability of a special verdict or interrogatory on that subject (see Rule 49), rather than leaving the matter to a possibly ambiguous general verdict.

One final point should be made here that might otherwise tend to get lost in all the twists and turns of the Illinois-public-policy analysis. It must always be remembered that the Policy *is* Minnesota-based, and any potential nonenforcement of its clear coverage provisions has to rest on the notion of an Illinois public policy that would override them. For that purpose the vetoing public policy ought to be clear indeed before it is permitted to interfere with deliberately-entered-into contractual relationships between business concerns. Although someone parsing the relevant authorities might perhaps arrive at a different destination from that reached by this Court, it simply could not be said that any arguable Illinois policy against coverage was so powerful and unequivocal as to supplant what the parties have bargained for, what Beltmann has paid for and what U.S. Fire has promised to provide in consideration of that payment.

## Conclusion

U.S. Fire has not shown that it is entitled to judgment on the pleadings. Quite the contrary is true: Although Beltmann has not filed a countermotion to enforce its own counterclaim for declaratory relief, the analysis in this opinion compels a declaration that:

1. the Policy potentially provides valid coverage of Cash's retaliatory discharge claim to the extent of any compensatory damage award on that claim and

2. pending resolution of that claim, U.S. Fire must therefore bear the costs of defense of the Cash Action allocable to that claim.

In all other respects the litigation poses no present case or controversy cognizable under Article III. Because this opinion and the just-stated declaration have therefore resolved all justiciable issues over which this Court has jurisdiction, this is a final order terminating this action.